*In the Matter of* JOYCE QUESNELL.

JOYCE QUESNELL, *Appellant*, v. THE STATE OF WASHINGTON, *Respondent.*

*Landon R. Estep* (of *Lundin, Estep, Sindell & Haley, Inc., P.S.*), for appellant.

*Christopher T. Bayley, Prosecuting Attorney, Michael L. Cohen, Assistant Chief Deputy,* and *Carolyn P. Garbutt, Deputy,* for respondent.

FINLEY, J.—This appeal concerns a mental illness civil commitment proceeding brought against the appellant, Joyce Quesnell, pursuant to RCW 71.02.120. The appeal is taken from a lower court order denying a motion by the appellant to vacate an earlier order of hospitalization committing her to Western State Hospital. The appellant charges that the commitment proceeding below was conducted in violation of her constitutional guarantees to due process of law and trial by jury.

The facts underlying this appeal are as follows: On January 13, 1971, the parents of Joyce Quesnell executed and filed with the King County Clerk an application seeking to have Joyce civilly committed as an insane person. An order for the appellant's immediate apprehension and detention pending hearing and examination, and an order fixing the time of hearing were entered the same day. On January 17, 1971, the appellant was apprehended, served with a copy of the application and notice of hearing, and detained at Harborview Medical Center in Seattle until January 19, 1971, when a hearing was held on this application. Jerry Spoonemore, an attorney, was appointed guardian ad litem for the appellant as well as for all other persons on the January 19, 1971, mental illness calendar. Mr. Spoonemore did not provide the appellant with an attorney other than himself,

although he later stated that he was uncertain of the degree of advocacy contemplated by his role as guardian ad litem. Ms. Quesnell was not made aware of the specific allegations pertaining to mental illness until after the hearing commenced. At the hearing, Mr. Spoonemore called no witnesses on behalf of the appellant. The record further indicates that the appellant was absent throughout the hearing except for a few minutes when she was questioned; she was then removed from the hearing room before the recommendations for commitment or release were made by the psychiatrists on the case, and was not apprised of the nature of these recommendations until after the hospitalization order was entered. Mr. Spoonemore had no opportunity to discuss the proceedings with the appellant during the hearing. No record of the hearing was made by court reporter. At the conclusion of the hearing, the appellant was committed to Western State Hospital. On January 27, 1971, the appellant filed a motion for order reviewing act of court commissioner which was ultimately heard by Judge Horton Smith of the King County Superior Court. On March 23, 1971, Judge Smith entered an order vacating the commitment. He supported the vacation order with findings of fact and conclusions of law. The application came before Commissioner Niles on remand for a new hearing on March 30, 1971. Even though the appellant was represented by private counsel, the King County Superior Court (Mental Illness Division) appointed Peter Lind, an attorney, as guardian ad litem for the appellant at this hearing, as well as for all others appearing on the commitment calendar that day. With the assistance of her private counsel, the appellant timely filed a demand for a jury trial pursuant to RCW 71.02.210. Peter Lind, guardian ad litem, wrote upon the jury demand: "In the best interest of the patient and in her behalf, I do not request or permit a jury demand." Commissioner Niles rejected the demand for a jury trial and proceeded with the hearing. An adjournment was then obtained by appellant's private counsel to allow him an opportunity to employ a court reporter for the purpose of

documenting the reasons for the court's refusal to grant the demand for jury trial. On April 1, 1971, the hearing reconvened and a record of the proceedings was taken. Present were the appellant's private attorney and also Edward Langenbach, Jr., an attorney who had been appointed by the superior court to act as guardian ad litem for the appellant and all others appearing on the commitment calendar that day. In response to a reassertion by appellant's private counsel of the demand for trial by jury, Commissioner Niles ruled that such procedural right had been effectively waived by the appellant's former guardian ad litem. Subsequently, an order of hospitalization was entered. On April 9, 1971, the appellant filed a motion for revising act of court commissioner. Judge Horton Smith heard the motion and entered an order denying motion to vacate.

On appeal, we are asked to determine whether the appellant's second court-appointed guardian ad litem had sufficient authority to refuse and effectively override a timely demand made by the appellant and her private counsel pursuant to RCW 71.02.210 for a trial by jury. Initially, however, we shall consider and review the subject proceedings in terms of due process of law as guaranteed the appellant by U.S. Const. amend. 14, and Const. art. 1, § 3.

With the advent of state-supported asylums in the middle of the eighteenth century, and for some time thereafter, the procedure for involuntary commitment of an alleged mentally ill person amounted to an informal request made by the subject's friend, relative, or even enemy, for an order of admission, and the immediate response of some member of the hospital staff in issuing the requested order as a matter of course.[1] With the advance of psychiatry, the involuntary patient began to receive treatment;[2] with the

[1]See S. Brakel & R. Rock, The Mentally Disabled and the Law 34 (1971); T. Szasz, Law, Liberty, and Psychiatry 57-58 (1963).

[2]The effectiveness of institutional treatment, however, even under current standards, is the subject of several challenges:

According to a recent survey, eighty per cent of mental institutions are purely custodial, providing no treatment of any significance even to their law-abiding patients for whom they are run. A good

measured progression of the law, and a growing awareness that such patients were often wrongfully incarcerated, the "railroading" techniques characteristic of earlier commitment proceedings came under legislative scrutiny and judicial review. Today the astounding rate of involuntary admissions to the nation's mental hospitals poses for our courts the difficult task of establishing a process of evaluation and administration that is not merely efficient, but fair to the individuals involved.[3] These ends of fairness and efficiency can be antagonistic or complementary depending upon the nature of this judicial process. In this regard, the recent development of certain constitutional guarantees in the protection of those of our citizens alleged to be mentally ill are significant and encouraging.

In 1967, the United States Supreme Court undertook a difficult and major review of the extent to which civil proceedings which could result in some form of incarceration were subject to judicial scrutiny and testing on constitutional grounds. Addressing itself to the procedural consequences of an alleged distinction between civil and criminal actions, the court, *In re Gault*, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967), observed the following characteristics of juvenile court proceedings:

> The rules of criminal procedure were therefore altogether inapplicable. The apparent rigidities, technicalities, and harshness which they observed in both substantive and procedural criminal law were therefore to be discarded. The idea of crime and punishment was to be abandoned. The child was to be "treated" and "rehabilitated" and the procedures, from apprehension through institutionalization, were to be "clinical" rather than punitive.

proportion of the remaining twenty per cent provide adequate treatment only for well-paying private patients.
Schmideberg, *The Promise of Psychiatry: Hopes and Disillusionment,* 57 Nw. U.L. Rev. 19, 22 (1962).

[3]Dr. Thomas S. Szasz has observed an annual mental institution commitment rate of 250,000, with the total number of committed patients at any one time in excess of one million. He further notes that of the 7,000 committed mental patients at St. Elizabeth's Hospital, Washington, D.C., in 1960, only 265 had been admitted voluntarily. T. Szasz, *Law, Liberty, and Psychiatry* 40, 60. *See also* Harris, *Mental Illness, Due Process and Lawyers,* 55 A.B.A.J. 65, 67 (1969).

These results were to be achieved, without coming to conceptual and constitutional grief, by insisting that the proceedings were not adversary, but that the state was proceeding as *parens patriae*. The Latin phrase proved to be a great help to those who sought to rationalize the exclusion of juveniles from the constitutional scheme; but its meaning is murky and its historic credentials are of dubious relevance.

(Footnote omitted.) *In re Gault, supra* at 15-16. In piercing the civil veil of the juvenile commitment proceeding, the court closely examined the consequences of involuntary incarceration:

The boy is committed to an institution where he may be restrained of liberty for years. It is of no constitutional consequence—and of limited practical meaning—that the institution to which he is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a "receiving home" or an "industrial school" for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes "a building with whitewashed walls, regimented routine and institutional hours. . . ." Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees, . . .

(Footnote omitted.) *In re Gault, supra* at 27. Because of this confinement, the Supreme Court rejected the characterization of the proceedings as "civil" in nature, and concluded that the juvenile defendant was entitled to the guarantees of due process of law, stating:

To hold otherwise would be to disregard substance because of the feeble enticement of the "civil" label-of-convenience which has been attached to juvenile proceedings. . . . For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called "criminal" or "civil."

*In re Gault, supra* at 49-50. Consistent with *Gault,* the Supreme Court has held that the mental illness commitment proceeding, "whether denominated civil or criminal," is subject to the constitutional guarantee of due process of

law. *Specht v. Patterson,* 386 U.S. 605, 608, 18 L. Ed. 2d 326, 87 S. Ct. 1209 (1967).[4] Upon this basis, and in the same manner of judicial scrutiny utilized in *Gault,* the following comparative observations were made concerning the involuntary commitment of persons alleged to be mentally ill:

> We do not have the distinction between the procedures used to commit juveniles and adults as in Gault. But, like Gault, and of utmost importance, we have a situtation in which the liberty of an individual is at stake, and we think the reasoning in Gault emphatically applies. It matters not whether the proceedings be labeled "civil" or "criminal" or whether the subject matter be mental instability or juvenile delinquency. It is the likelihood of involuntary incarceration—whether for punishment as an adult for a crime, rehabilitation as a juvenile for delinquency, or treatment and training as a feeble-minded or mental incompetent—which commands observance of the constitutional safeguards of due process. Where, as in both proceedings for juveniles and mentally deficient persons, the state undertakes to act in parens patriae, *it has the inescapable duty to vouchsafe due process* . . . Fourteenth Amendment due process requires that the infirm person, or one acting in his behalf, be fully advised of his rights and accorded each of them unless knowingly and understandingly waived.

(Italics ours.) *Heryford v. Parker,* 396 F.2d 393, 396 (10th Cir. 1968). *Accord, Commonwealth v. Gomes,* 355 Mass. 479, 245 N.E.2d 429 (1969); *Millard v. Harris,* 406 F.2d 964 (D.C. Cir. 1968); *Holm v. State,* 404 P.2d 740 (Wyo. 1965); *People v. English,* 31 Ill. 2d 301, 201 N.E.2d 455 (1964); *Denton v. Commonwealth,* 383 S.W.2d 681 (Ky. 1964); *In re Lambert,* 134 Cal. 626, 66 P. 851 (1901).[5] Since each

---

[4]Though perhaps abused through neglect, the requirement that the mental commitment proceeding be conducted in conformity with the mandates of due process has been a part of our law for three-quarters of a century. *Simon v. Craft,* 182 U.S. 427, 45 L. Ed. 1165, 21 S. Ct. 836 (1901).

[5]*See also* S. Brakel & R. Rock, *The Mentally Disabled and the Law* 55; Cohen, *The Function of the Attorney and the Commitment of the Mentally Ill,* 44 Tex. L. Rev. 424, 448-49 (1966); Curran, *Hospitalization of the Mentally Ill,* 31 N.C.L. Rev. 274, 277 (1953); Comment, *California's New Mental Commitment Legislation: Is It Legally*

person accused of mental illness is guaranteed the full protection of due process of law before he may be subjected to any deprivation of his liberty, the Supreme Court in *Minnesota ex rel. Pearson v. Probate Court,* 309 U.S. 270, 276-77, 84 L. Ed. 744, 60 S. Ct. 523 (1940) has emphasized and condemned the constitutional insufficiency of mere promises of a "fair hearing":

> We fully recognize the danger of a deprivation of due process in proceedings dealing with persons charged with insanity or, as here, with a psychopathic personality as defined in the statute, and the special importance of maintaining the basic interests of liberty in a class of cases where the law though "fair on its face and impartial in appearance" may be open to serious abuses in administration and courts may be imposed upon if the substantial rights of the persons charged are not adequately safeguarded at every stage of the proceedings.

With these guidelines before us, we undertake a close examination of the Washington procedure for the involuntary commitment of persons alleged to be mentally ill, as well as the practical application of this procedure in the case of the appellant, Joyce Quesnell.[6]

The Washington statutory scheme for commitment of the mentally ill embraces certain basic elements of procedural due process of law.[7] The defendant must be provided notice

*Sufficient?,* 6 Calif. W.L. Rev. 146, 158 (1969); Comment, *Civil Commitment of the Mentally Ill,* 30 U. Pitt. L. Rev. 752, 762-69 (1969); Comment, *Civil Restraint, Mental Illness, and the Right to Treatment,* 77 Yale L.J. 87, 100-01 (1967); Comment, *Due Process for All—Constitutional Standards for Involuntary Civil Commitment and Release,* 34 U. Chi. L. Rev. 633, 636-37 (1967); Note, 10 Duq. L. Rev. 674 (1972).

[6]"Measures which subject individuals to the substantial and involuntary deprivation of their liberty contain an inescapable punitive element, and this reality is not altered by the facts that the motivations that prompt incarceration are to provide therapy or otherwise contribute to the person's well-being or reform. As such, these measures must be closely scrutinized to insure that power is being applied consistently with those values of the community that justify interference with liberty for only the most clear and compelling reasons." F. Allen, *The Borderland of Criminal Justice* 37 (1964).

[7]For a comparative study of statutory commitment procedures in other jurisdictions, *see* Comment, *Involuntary Civil Commitment in*

of the hearing, and advised of his rights to representation by counsel and trial by jury.[8] Additional provisions specifically guarantee this right to counsel,[9] and the duty of the court to grant a timely demand for jury trial.[10] Finally, the defendant is entitled to produce witnesses and evidence in his own behalf during the hearing.[11] That these statutory rights are to be preserved inviolate is evinced by the stated intent of the legislature in RCW 71.02.900:

> The provisions of this chapter shall be liberally construed so that persons who are in need of care and treatment for mental illness shall receive humane care and treatment and be restored to normal mental condition as rapidly as possible with an avoidance of loss of civil rights where not necessary, and with as little formality as possible, *still preserving all rights and all privileges of the person as guaranteed by the Constitution.*

(Italics ours.) The respondent construes the intent of this section as authority for its contentions that the primary purpose of chapter 71.02 RCW is the guarantee of rapid

---

*Oregon,* 9 Will. L.J. 63 (1973); Comment, *Involuntary Civil Commitment and the Right to Treatment in Pennsylvania,* 15 Vill. L. Rev. 951 (1970); Comment, *Contemporary Studies Project: Facts and Fallacies About Iowa Civil Commitment,* 55 Iowa L. Rev. 895 (1970); Comment, *The Language of Involuntary Mental Hospitalization: A Study in Sound and Fury,* 4 U. Mich. J.L. Ref. 195 (1970) (statutory procedure in Michigan examined); Comment, *Civil Commitment Procedure in Louisiana,* 31 La. L. Rev. 149 (1970); Brofman, *Civil Commitment of the Mentally Ill in the Denver Probate Court,* 46 Denver L.J. 496 (1969); Johnson, *Due Process in Involuntary Civil Commitment and Incompetency Adjudication Proceedings: Where Does Colorado Stand?,* 46 Denver L.J. 516 (1969); Comment, *Civil Commitment of the Mentally Ill in Nebraska,* 48 Neb. L. Rev. 255 (1968); Tao, *Civil Commitment of the Mentally Ill in the District of Columbia,* 13 How. L.J. 303 (1967); Comment, *Involuntary Commitment of the Mentally Ill in Pennsylvania,* 5 Duq. L. Rev. 487 (1967); Dix, *Hospitalization of the Mentally Ill in Wisconsin: A Need for Reexamination,* 51 Marq. L. Rev. 1 (1967); Note, 16 N.Y.L.F. 165 (1970) (involuntary commitment procedure in New York).

[8] RCW 71.02.140.

[9] RCW 71.02.190.

[10] RCW 71.02.210.

[11] RCW 71.02.170.

"treatment" for the accused; that, as a "civil" proceeding, the commitment hearing is to be conducted in a "clinical," nonadversary atmosphere; and that, in ensuring that the hearing has no psychologically damaging effect upon the defendant, and in pursuance of the single duty of acting in the best interest of the accused, the guardian ad litem is empowered with sufficient authority to reject and override a demand made by the accused and her private attorney for trial by jury. We disagree.

The subtle, paternalistic contention that the state's obligation as parens patriae contemplates and permits some deviation from according an accused the full guarantee of due process was forcefully rejected in *In re Gault,* 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967), and *Specht v. Patterson,* 386 U.S. 605, 18 L. Ed. 2d 326, 87 S. Ct. 1209 (1967).[12] Further, the use of beneficent, self-serving labels such as "civil," "clinical," and "treatment" as a means of supporting procedural aberrations in the mental illness hearing constitutes an intolerable abuse of the duty to ensure stringent protection of constitutional and statutory rights.[13] The most formidable abridgment of due process

---

[12]The frequent use of the *"parens patriae"* excuse is observed in Gupta, *New York's Mental Health Information Service: An Experiment in Due Process,* 25 Rutgers L. Rev. 405, 406-07 (1971):

Statutory authority for involuntary hospitalization of the mentally ill has usually been derived from the state's police power or obligation as *parens patriae.* Legislatures pretending to be humane tend to rely on the state's obligation as *parens patriae,* and consider suspending due process guarantees in involuntary commitment laws an act of generosity toward the mentally ill. Consequently, notice, hearing, right to counsel, and jury trial have been variously provided for or not according to the source of statutory authority emphasized.

*See also* N. Kittrie, *The Right to be Different* 8-11 (1971); Taylor, *A Critical Look Into the Involuntary Civil Commitment Procedure,* 10 Washburn L.J. 237, 239-40 (1971); Ross, *Commitment of the Mentally Ill: Problems of Law and Policy,* 57 Mich. L. Rev. 945, 956-60 (1959).

[13]"One technique for denying that commitment is punishment is to clothe it in a mantle of therapeutic paternalism. . . .

". . .

"In examining the constitutional rights of the mentally ill, we must remember that, until now, the courts have regarded involuntary "hospi-

guarantees however occurs where "lip service" is paid to certain rights of the accused as a mere formality, with the consequence that any substantive protection is woefully lacking. In this regard, the facts of the instant case suggest the practical degree to which the Washington defendant charged with mental illness is accorded the "letter of the law." Here, pursuant to RCW 71.02.190, a guardian ad litem was appointed to represent the appellant. However, the "assistance of counsel," as guaranteed by both federal and state constitutions, amounted to a 15-minute conversation by the guardian ad litem with the appellant. No meaningful form of representation can occur (1) if the guardian ad litem does not provide the accused with the adversarial services of an attorney, either in his capacity as guardian ad litem or with the assistance of another attorney, (2) if the guardian honestly believes the "best interests" of the defendant will be served but the entire hearing is devoid of any instance of discussion between guardian and client to determine the best interests of the defendant. Such a passive role of an attorney as guardian ad litem becomes even more critical and suspect where this guardian must represent all other persons on the courts' calendar for that day, and where on subsequent days different guardians ad item are appointed for the accused, whose only actions on her behalf comprise waiving her right to trial by jury contrary to her timely demand therefor. It is evident from these circumstances of record that the right of the allegedly mentally ill person to the assistance of counsel must be considered and afforded in a meaningful way rather than in form only. Meaningful legal representation in the instant case is as slight as that reported in and condemned in *Hultquist v. People,* 77 Colo.

---

talization" and involuntary mental "treatment" as therapeutic, not punitive. Accordingly, legal proceedings authorizing these abominations have been considered civil rather than criminal. Hence, the constitutional guarantees so jealously guarded by the courts in criminal proceedings have failed to apply to the victims of psychiatry precisely because they have been defined as *"patients!"* T. Szasz, *Law, Liberty, and Psychiatry* 43, 185.

310, 317, 236 P. 995 (1925), where the Supreme Court of Colorado reversed an order of commitment for failure of the guardian ad litem to provide the accused with the effective assistance of counsel, and stated: [14]

The undisputed facts, and as we have found them to be clearly show that the defendant did not have the kind of a hearing which she is entitled to under the statute. The guardian ad litem did nothing whatever to protect her rights. He attempted to waive them before he had ever seen or conversed with her, or knew her condition.

It is apparent that meaningful representation of the person alleged to be mentally ill as provided by RCW 71.02.190, and the practical application of that statutory right may be considerably at odds in the day-to-day grinding of the wheels of justice. Much of this ambivalence is created by the lack of judicially enunciated, appropriate standards or guidelines defining the role of the guardian ad litem and the scope of his authority. [15]

It is well settled that the guardian ad litem is appointed for the benefit of and to protect the rights and best interests of the alleged incompetent to whom he is assigned. *Mood v. Mader*, 162 Wash. 83, 298 P. 329 (1931);

---

[14]That the conduct of the guardian ad litem in both *Hultquist* and the instant case is not uncommon is apparent from the descriptive presentation set out in Cohen, *The Function of the Attorney and the Commitment of the Mentally Ill*, 44 Tex. L. Rev. 424, 428-29 (1966).

[15]The Lawyer representing a prospective patient in a typical civil commitment proceeding is a stranger in a strange land without benefit of guidebook, map, or dictionary. Too often he shows no interest and makes no effort to learn his way about his foreign environment. As a result, free citizens of a free country are frequently deprived of their liberty for an indefinite duration.

(Footnote omitted.) Cohen, *The Function of the Attorney and the Commitment of the Mentally Ill*, *supra* at 424. Additionally, however, we cannot escape the observation that this conflict may be partially caused by the current inadequacy of remuneration for effective services. *See* J. Paul, *Involuntary Commitment in King County: The Guardian Ad Litem* 19, n.5 (1972); Johnson, *Due Process in Involuntary Civil Commitment and Incompetency Adjudication Proceedings: Where Does Colorado Stand?*, 46 Denver L.J. 516, at 536-37 (1969).

*Mattson v. Mattson*, 29 Wash. 417, 69 P. 1087 (1902). For these purposes, it is essential that he act as an advocate in behalf of the accused.

Direct observation of commitment hearings and extensive interviews with participating attorneys lead to the conclusion that unless the proceeding is adversary in nature (and here that equates with a jury trial), the attorney does not engage in any preparation and does not effectively participate in the hearing.

Cohen, *The Function of the Attorney and the Commitment of the Mentally Ill*, 44 Tex. L. Rev. 424 (1966). This view was recently sustained in *Lessard v. Schmidt*, 349 F. Supp. 1078, 1103 (E.D. Wis. 1972) where the court held, in part, that the Wisconsin civil commitment procedure was "constitutionally defective" insofar as it "permits commitment based upon a hearing in which the person charged with mental illness is not represented by *adversary* counsel . . ."[16] (Italics ours.) Accordingly, "[i]t is the duty of a guardian ad litem to submit to the court all relevant defenses or legal claims his client may have." *In re Estate of Manning*, 85 Neb. 60, 122 N.W. 711, 713 (1909).[17] In the absence of an affirmative effort to provide protection as indicated for the fundamental rights of the alleged mentally ill ward, the appointment of the guardian ad litem can become a "mere formality" and a meaningless gesture. *Kroot v. Liberty Bank*, 307 Ill. App. 209, 30 N.E.2d 92, 94 (1940). The nonadversary guardian ad litem necessarily does not afford realization of constitutional and statutory

---

[16]"Nowhere is there any indication of the role which the guardian is to play in the proceedings. The record in this case makes clear, however, that the guardian does not view his role as that of an adversary counsel, and thus cannot take the place of counsel unless his role is restructured." *Lessard v. Schmidt*, 349 F. Supp. 1078, 1097 (E.D. Wis. 1972).

[17]"The rights of the involuntarily held mental patient can never be fully protected unless he is represented by a lawyer who carefully tests each element of the case presented against his allegedly mentally ill client." Harris, *Mental Illness, Due Process and Lawyers*, 55 A.B.A.J. 65, 66 (1969).

guarantees in regard to the assistance of counsel. *Sorter v. Austen,* 221 Ala. 481, 129 So. 51 (1930).[18]

Inherent within the requirement of affirmative advocacy is the duty of the guardian ad litem to actively investigate the charges against the accused and the facts upon which they are based.[19] In this regard, the United States Supreme Court, in *Powell v. Alabama,* 287 U.S. 45, 58, 77 L. Ed. 158, 53 S. Ct. 55, 84 A.L.R. 527 (1932) held the following:

> It is not enough to assume that counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thoroughgoing investigation might disclose as to the facts. No attempt was made to investigate. No opportunity to do so was given. Defendants were immediately hurried to trial. Chief Justice Anderson, after disclaiming any intention to criticize harshly counsel who attempted to represent defendants at the trials, said: ". . . the record indicates that the appearance was rather *pro forma* than zealous and active . . ." Under the circumstances disclosed, we hold that defendants were not accorded the right of counsel in any substantial sense. To decide otherwise, would simply be to ignore actualities.

---

[18]*See also* Comment, *Contemporary Studies Project: Facts and Fallacies About Iowa Civil Commitment,* 55 Iowa L. Rev. 895, 922-23 (1970); Comment, *California's New Mental Commitment Legislation: Is It Legally Sufficient?,* 6 Calif. W.L. Rev. 146, 163 (1969). The lack of adversary representation leaves the burden of refuting the charge to the accused ward:

> To me, it is unfair to demand of a psychiatric patient—especially if he is poorly educated and indigent—that he prove his sanity or nondangerousness. We would not ask that he prove his innocence of a criminal charge, and then consider his mere opportunity to do so adequate protection against false or unfair accusations by a district attorney. Yet, this is exactly what we ask the mental patient to do. To make matters worse, such a person must rebut charges of mental illness, charges as amorphous as anything with which K., Kafka's protagonist in *The Trial,* had to contend. It is obvious that such a "defendant" is almost completely helpless and has small chance of winning his battle . . .

T. Szasz, *Law, Liberty, and Psychiatry* 69.

[19]*See* Brofman, *Civil Commitment of the Mentally Ill in the Denver Probate Court,* 46 Denver L.J. 496, 501 (1969).

In preparation for the commitment hearing, the duty to investigate contemplates the following:

> Prior to the hearing the attorney must make a thorough study of all the records that are available to him through the court, the hospital, and, at times, social agencies. He must always communicate with the proposed patient and, where possible, family and friends. The attorney should work toward an understanding of the events that led up to and contributed to the filing of the petition. Only in this way can he attempt to develop possible alternatives to hospitalization.

Cohen, *supra* at 452. As noted immediately above, a full investigation necessarily entails a meaningful consultation with the client, explaining the legal consequences of commitment and exploring all relevant factors in his defense.[20]

██ ██ Of utmost importance, and consistent with the earlier-stated duty of the guardian ad litem to actively protect the rights of his client, is the prohibition against waiver of such rights:

> As an attorney, he is impliedly authorized to enter into stipulations and waivers concerning procedural matters to facilitate the hearing. However, in his capacity as attorney, he has no authority to waive any substantial right of his client. Such waiver, to be binding upon the client, must be specially authorized by him. As stated in *Wagner v. Peshastin Lumber Co.*, 149 Wash. 328, 337, 270 P. 1032 (1928), "It will be readily admitted that an attorney without special authority has no right to stipulate away a valuable right of his client." . . .
>
> . . .
> Even if the appointment is one made after hearing and determination of incompetency, the guardian ad litem is no more permitted to waive a substantial right of the

---

[20]*See* S. Brakel & R. Rock, *The Mentally Disabled and the Law* 55, 62. One commentator has concluded as follows:

> It is not adequate to have a public attorney or a public defender appear merely at the court hearings. From our observations, this type of legal representation proves ineffectual in practice. I feel that the patient needs a much different type of representation. He needs someone to "listen to his case"; someone who can give him advice about the legal consequences of hospitalization.

R. Janopaul, *Problems in Hospitalizing the Mentally Ill* 13 (1962).

ward than is an attorney for a competent client. *Calhoun County Bank v. Ellison,* 133 W. Va. 9, 54 S.E.2d 182 (1949); *Fox v. Starbuck,* 115 W. Va. 39, 174 S.E. 484 (1934); *First Trust Co. v. Hammond,* 139 Neb. 546, 298 N.W. 144 (1941); *Peterson v. Hague,* 51 Idaho 175, 4 P.2d 350 (1931).

*In re Houts,* 7 Wn. App. 476, 481, 482, 499 P.2d 1276 (1972). The rationale in support of this rule was stated by this court in *Graham v. Graham,* 40 Wn.2d 64, 67-68, 240 P.2d 564 (1952) as follows:

> There is something fundamental in the matter of a litigant being able to use his personal judgment and intelligence in connection with a lawsuit affecting him, and in not having a guardian's judgment and intelligence substituted relative to the litigation affecting the alleged incompetent. Furthermore, there is something fundamental in a party litigant being able to employ an attorney of his voluntary choice to represent him in court and in being free to reject or accept the advice of such attorney.

*See* Note, 79 Harv. L. Rev. 1288, 1295, 1297 (1966). Before proceeding further, however, we are faced with a contention by the respondent that, owing to the "serious mental illness" of the accused, the guardian ad litem is in a better position to determine the advisability of waiver. However, it being the very function of the mental illness hearing to adjudicate the issue of sanity, the legislature specifically has accorded the accused all presumptions of mental competence in RCW 71.02.650:

> Any person complained against in any application or proceedings started by virtue of the provisions of this chapter shall not forfeit or suffer any legal disability by the reason of the pendency of proceedings under this chapter, until an order declaring such person to be mentally ill has been entered.

Accompanying this presumption of competency is a presumption against waiver of fundamental rights:

> It has been pointed out that "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights and that we "do not presume acquiescence in the loss of fundamental rights." A waiver is

ordinarily an intentional relinquishment or abandonment of a known right or privilege.

(Footnotes omitted.) *Johnson v. Zerbst,* 304 U.S. 458, 464, 82 L. Ed. 1461, 58 S. Ct. 1019, 146 A.L.R. 357 (1938). *Accord, Carnley v. Cochran,* 369 U.S. 506, 8 L. Ed. 2d 70, 82 S. Ct. 884 (1962). Therefore, in the absence of knowing consent by the person alleged to be mentally ill, a guardian ad litem may not waive any fundamental right relevant to the mental illness commitment proceeding. *See Hagen v. Rekow,* 253 Minn. 341, 91 N.W.2d 768, 771 (1958); *Anderson v. Anderson,* 133 N.J. Eq. 311, 32 A.2d 83 (1943); *Hodges v. Hale,* 20 Tenn. App. 233, 97 S.W.2d 454 (1936); *Rausch v. Cozian,* 86 Colo. 389, 282 P. 251 (1929).[21] In the case before us, it is apparent from the fact of the appellant's demand for trial by jury that she had no intention of relinquishing this right. The only remaining question in this regard then is whether the right to trial by jury is sufficiently "fundamental" as to fall within the rule prohibiting waiver without the consent of the alleged mentally ill person. In this there can be no doubt.

■ First, the right to trial by jury in Washington mental illness proceedings is guaranteed by constitution (Const. art. 1, § 21) and statute (RCW 71.02.210). Second, a court

---

[21]Such fundamental rights pertinent to the mental illness proceeding include confrontation and cross-examination (*see Pointer v. Texas,* 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965); Elliott, *Procedures for Involuntary Commitment on the Basis of Alleged Mental Illness,* 42 U. Colo. L. Rev. 231, 261 (1970)), as well as a transcript of the proceedings to permit effective review on appeal (*State ex rel. Adams v. May,* 196 Md. 152, 75 A.2d 839 (1950); *see Kent v. United States,* 383 U.S. 541, 561, 16 L. Ed. 2d 84, 86 S. Ct. 1045 (1966); *Griffin v. Illinois,* 351 U.S. 12, 100 L. Ed. 891, 76 S. Ct. 585 (1956)). The argument of the respondent that the appellant "would have been determined to be mentally ill with or without a court reporter being present," essentially obviating the need for a written record of the proceedings, is totally without merit. Since the mental illness proceeding is to be handled as a probate matter (RCW 71.02.110), and since an appeal may be had from any order, judgment or decree of the probate court (RCW 11.96.010), it is essential for purposes of effective review on appeal that a transcript of the contested lower court proceedings be made available to the appellate court. *See State v. Collman,* 497 P.2d 1233, 1239-40 (Ore. 1972).

acts in excess of its jurisdiction where such proceedings are conducted without a jury after a timely demand has been made for trial by jury either by, or on behalf of, the accused. *In re Ellern,* 23 Wn.2d 219, 160 P.2d 639 (1945); *Strickland v. Peacock,* 209 Ga. 773, 77 S.E.2d 14 (1953); *In re Cash,* 383 Ill. 409, 50 N.E.2d 487 (1943); *Johnson v. Nelms,* 171 Tenn. 54, 100 S.W.2d 648 (1937); *White v. White,* 108 Tex. 570, 196 S.W. 508 (1917). Third, the jury plays an essential role in guarding against wrongful commitment:[22]

[T]he jury serves the critical function of introducing into the process a lay judgment, reflecting values generally held in the community, concerning the kinds of potential

---

[22]Those who object to the use of a jury trial in such procedures usually base their objection on the fact that laymen are placed in the position of evaluating expert testimony as to the mental condition of the proposed patient, a job which it is doubtful they can handle. This argument overlooks the fact, however, that the jury in such a case is not required to make a medical diagnosis of the allegedly mentally ill person. They are required only to decide, on the basis of expert medical testimony, whether the condition of the proposed patient is such that his commitment is justified under the statute.

(Footnotes omitted.) Comment, *Civil Commitment of the Mentally Ill in Nebraska,* 48 Neb. L. Rev. 255, 270 (1968). *See* Ross, *Commitment of the Mentally Ill: Problems of Law and Policy,* 57 Mich. L. Rev. 945, 970 (1959). As indicated earlier, the respondent attempts to justify the guardian ad litem's rejection of appellant's jury demand on the ground that this manner of trial may subject the accused to traumatic experience. In this regard, one commentator has observed the following:

Arguments exist for and against the use of a jury. But even though a jury may subject an alleged mentally ill person to additional trauma, it is an additional buffer against wrongful deprivation of liberty.

(Footnote omitted.) Comment, *Involuntary Civil Commitment in Oregon,* 9 Will. L.J. 63, 75 (1973). Indeed, this beneficent and protective attitude may be misdirected:

Jury trials are time consuming and frequently traumatic for the testifying doctor, notwithstanding the fact that doctors emphasize the supposed trauma to the patient. If the patient appears at the hearing, the doctor may have to take the time to fully explain the case, and to do so in the presence of the patient may be uncomfortable.

Cohen, *The Function of the Attorney and the Commitment of the Mentally Ill,* 44 Tex. L. Rev. 424, 447 (1966).

harm that justify the State in confining a person for compulsory treatment.

*Humphrey v. Cady,* 405 U.S. 504, 509, 31 L. Ed. 2d 394, 92 S. Ct. 1048 (1972). Upon similar reasoning, the Supreme Court characterized the deference and respect to be accorded the right to trial by jury in *Jacob v. New York,* 315 U.S. 752, 753, 86 L. Ed. 1166, 62 S. Ct. 854 (1942) as follows:

> The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of . . . jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts.

Upon these bases, the right to trial by jury in civil commitment proceedings is clearly fundamental. As such, this right cannot be waived by a guardian ad litem without the knowing consent of the person charged with being mentally ill. *Heryford v. Parker,* 396 F.2d 393 (10th Cir. 1968). Therefore, under the facts of the case at bar, we hold that it was error to conduct the immediate proceedings without a jury after an attempted invocation of this right by the appellant.[23] We cannot sanction the abridgment of a fundamental constitutional and statutory right upon the basis of what may have been a well-intentioned waiver of that right by a guardian ad litem.

Finally, it is charged by the respondent that the jury demand made by the appellant and her private counsel was justifiably rejected since the appointed guardian ad litem,

---

[23]Our ruling in this case is limited strictly to the single issue involved. This is simply that the right to trial by jury must be granted upon timely demand in incompetency proceedings. Beyond the scope of this case is the issue of whether the superior court (under given circumstances and subject to procedural due process safeguards) may assess the competency of an alleged mentally ill person to comprehend and participate in a jury trial on the question of commitment. Perhaps any such special inquiry may be part of the hearing relative to competency and commitment.

in overriding this demand, was exercising superior authority in behalf of the appellant. We disagree.

▆ No statutory basis exists in support of the suggestion that the authority of the guardian ad litem exceeds that of an alleged mentally ill person and her private counsel which was the situation in the instant case. Rather, the pertinent statute provides the following:

> At commencement of hearing *the person filed against,* his guardian, *attorney or guardian ad litem,* may request a trial by jury. Such request shall be in writing and filed with the court accompanied by the required fee. The court shall then enter an order directing the alleged mentally ill person to be detained pending trial and shall set a date for such trial.

(Italics ours.) RCW 71.02.210. Clearly, the right to trial by jury may be invoked by any one of these designated parties. Concerning provision for the vesting of primary powers of representation, RCW 71.02.190 states the following:

> If no guardian of the person has been appointed, the court *may* appoint a guardian ad litem to represent the patient during proceedings. *The person filed against shall have the right to be represented by an attorney if requested.*

(Italics ours.) Thus, the appointment of the guardian ad litem being discretionary and subject only to the constitutional guarantee that the accused be accorded the effective assistance of counsel, the duty of and authority for full representation of the defendant alleged to be mentally ill shall, upon request, be vested in a private attorney. *See In re Ervay,* 64 Wash. 138, 139, 116 P. 591 (1911). Further, consistent with the language and intent of RCW 71.02.190, this statutory right to exclusive representation by private counsel may be invoked at any stage of the proceedings against the accused.[24] Since a major factor conducive to

---

[24]The court has plenary power to revoke the appointment of a guardian ad litem and to substitute more effective counsel. *See Crockett v. Crockett,* 27 Wn.2d 877, 181 P.2d 180 (1947); *In re Hemrick,* 187 Wash. 21, 59 P.2d 748 (1936); *In re Dodson,* 135 Wash. 625, 238 P. 610 (1925); *In re Estate of Shapiro,* 131 Wash. 653, 230 P. 627 (1924); *State*

ineffective representation by the guardian ad litem has been shown by the record in this case to be the heavy caseload of appointments per calendar day, elementary logic dictates that a reduction in assigned cases through the substitution of private counsel will permit the guardian ad litem more time to spend in meaningful representation of his remaining clients. Therefore, under the facts of the instant case, the lower court erred in concluding that one of appellant's court-appointed guardians ad litem had effectively waived her right to trial by jury. Since timely demand for a jury was properly made by the appellant and her private attorney, and since full authority for the representation of the appellant was exclusively vested in this attorney concurrent with the request of the appellant, the court exceeded its jurisdiction in conducting the proceedings without a jury.

For the reasons indicated above, the order denying motion to vacate is reversed, and the cause is remanded for proceedings consistent with the opinion of this court.

ROSELLINI, WRIGHT, UTTER, and BRACHTENBACH, JJ., concur.

HALE, C.J. (concurring in the result)—Mental illness is undeniably one of the most tragic and persistent facts of life. That it is difficult to define does not make it impossible to recognize. That it does not readily yield to scientific classification does not mean that people suffering from severe manifestations of it cannot be helped by the state.

One thing, however, is certain: Mental illness will not be prevented nor alleviated nor cured by preachments about due process of law. No dissertations on constitutional theory, whether definitive or amorphous, nor a delineation of legislative history on the subject of mental illness nor an increase in the tempo of bureaucratic paper shuffling will help the patient.

---

ex rel. Barnard v. Superior Court, 74 Wash. 559, 134 P. 172 (1913); Jorgenson v. Winter, 69 Wash. 573, 125 P. 957 (1912). See also Note, 28 Wash. L. Rev. 75 (1953).

There has yet to be invented or discovered a judicial process which in one way or another is not susceptible of some abuse, and procedures for the involuntary confinement and treatment of mentally ill persons are no exception. A major function of the judiciary, therefore, in matters of mental illness is to prevent the abuse of such process but at the same time provide a workable system under which the mentally ill, for the protection of themselves and others, may be sequestered for care and treatment.

A workable procedural system allowing for isolation of the mentally ill, whose protection, care and treatment require hospitalization, means that the judicial process must be clinical and not penal. This demands a system affording a maximum of medical research, examination and treatment, and a minimum of adversary procedures. Wherever possible and consistent with the fundamental ideals that no one shall be held or confined anywhere by anyone against his will nor subjected to medication without his consent save upon the lawful orders of a court of competent jurisdiction, the adversary trappings of the judicial process should be avoided lest they do more harm to than good for both patient and public.

Authoritative estimates show that, during the 1960's, 25 percent of all hospital beds in the United States were occupied by schizophrenic patients; and that these schizophrenic patients represented one-half of the three-fourths million patients hospitalized for various kinds of mental illness. *See* Alexander & Selesnick, *The History of Psychiatry* (1966). The trial courts, unlike courts of review, are confronted daily with conditions rather than theories; they must meet the felt necessities of the times. Each day there come before the superior courts persons alleged to be very mentally ill, presenting then and there mental illness cases for speedy determination and which must be decided—and which cannot be theorized away by resort to detailed analyses about the basic rights of man.

Although I agree with the court's decision to remand the instant case for a jury trial, I dissent from the rationale

which engenders it. The remand should be done not because this record shows any hint whatever of what the court describes as "railroading" or a breach of duty on the part of the guardian ad litem, but simply because the guardian ad litem and the patient's private attorney disagreed on whether the circumstances would warrant a jury trial. The only question before us, then, is whether the prospective patient did effectually demand a jury trial. Through her private attorney, I think she did; and I think that the request thus made should have been allowed. Beyond that I would not go.

The state does not question here the right to a jury trial on demand nor that the patient's private counsel of record made such a demand. But after demand was first made by plaintiff's counsel in accordance with RCW 71.02.210, the question then arose whether the demand was properly denied for the reason that the guardian ad litem, differing with private counsel, sought to waive the jury trial. Under these circumstances, with both counsel and guardian ad litem apparently acting sincerely and responsibly for the best interests of the patient, but holding different views as to what those best interests required procedurally, I would resolve that difference as the majority has done by holding that the denial of the jury trial was in error. Where timely demand for a jury trial is made by the patient, his attorney, his guardian ad litem, or any one of the three, the statute ought to be construed so as to provide it.

There the matter should end. No earthshaking implications of constitutional due process inhere in this case. It presents no more than a problem of whether the trial court, under the statute, was presented with a timely and effective demand for a jury trial. Thus, after one cuts through layers of obiter dicta to discern its essential holding, *In re Gault*, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967), relied on by this court but which avoids the issue of trial by jury, has little or no application to and is of little precedential value in the case before us.

What are the ingredients of due process of law in mental

illness hearings? As in all judicial proceedings effecting a restraint upon the person, they start with the premise that some kind of curtailment of personal liberty is involved. It is impossible effectively to examine a person against his will except by detaining him; and all of the judicial rhetoric compiled on the subject will not alter this singular fact. There is no known way to detain a person without his consent except to detain him. But because the detention and eventual treatment may be done without the patient's consent and are, therefore, involuntary, there is no reason judicial proceedings, fully comporting with due process requirements, cannot be speedy, efficient, fair, and conducted in a clinical rather than punitive atmosphere.

Aside from emergent situations when reasonable minds could not help but agree that, to protect the putative patient or society from imminent danger, the individual should be taken into immediate custody, all constitutional requirements, I think, may be met by detention in a clinical-type quarter, speedy reference to the superior court, early examination by competent medical examiners acting under the auspices of the superior court and early hearing on the question of commitment with counsel acting for the patient either as guardian ad litem or, as in the instant case, private counsel of record at all critical stages of the proceedings. But in any event, counsel, whether as guardian ad litem or as attorney of record or in a dual capacity, should in good conscience feel free to exercise his judgment whether it would be bad for the patient to expose him to the delay and ordeal of a jury trial and that the right to trial by jury should be waived.

The court, relying on the *Gault* rationale, now assumes that, because the confinement for and treatment of mental illness may be involuntary, the procedure necessary to assure due process of law must inevitably be suffused with all of the accusatory trappings of the criminal courts, and that the procedural scheme in mental illness cases must, therefore, under the constitutions, be squared with the codes of criminal procedure and submitted to the same

constitutional standards as criminal trials. If, as the court implies, *Gault* is read to convey that principle, then we have left neither distinctive juvenile courts nor civil mental illness proceedings but simply additional criminal courts— some for young criminals and others for those thought to be mentally ill. To declare that *Gault* asserts the basic principles for the operation of juvenile courts and mental illness proceedings, will, I think, lead inevitably to the conclusion that children and the mentally ill, except for requiring a unanimous verdict, shall be forced to stand trial in the same manner as persons charged with crime.

I would reject this application of that case. *Gault*-like opinions should be limited to their precise fact pattern as was done in *McKeiver v. Pennsylvania,* 403 U.S. 528, 29 L. Ed. 2d 647, 91 S. Ct. 1976 (1971), expressly declaring that there existed no constitutional right to jury trial and sustaining the statutes of Pennsylvania and North Carolina denying a jury trial in juvenile court. It is impossible to apply the dicta of *Gault* rationally to the complex and infinitely varied situations arising daily in juvenile and mental illness proceedings without abridging those proceedings and crippling the benign purposes for which the juvenile and mental illness courts were established. We should not, I think, as this court now seems to do, employ the *Gault* yardstick as a measure here. If *Gault* is to be the rule of decision, then both attorney and guardian ad litem will be duty bound to demand a jury trial both in all juvenile delinquency cases and in all mental illness involuntary commitment proceedings. These will be the inevitable consequences of the *Gault* rationale, and are to be avoided lest they destroy the juvenile courts and convert mental illness hearings into criminal trials.

The court places great weight, too, I think, upon what it deems to be a holding in *Heryford v. Parker,* 396 F.2d 393, 396 (10th Cir. 1968), that jury trial cannot be waived by a guardian ad litem without the knowing consent of the person charged with being mentally ill. Aside from the apparent absurdity of such a proposition—a truly mentally ill

person could not volitionally waive anything—it should be remembered that, outside of Washington, D.C., that court has little responsibility for the prompt resolution of mental illness cases. Moreover, *Heryford* does not, as I read it, contribute to the paradox engendered by this court now in requiring the knowing consent of the *patient* to a waiver of jury trial by one who turns out to be mentally ill. *Heryford* holds no more, I think, than that "Fourteenth Amendment due process requires that the infirm person, *or one acting in his behalf,* be fully advised of his rights and accorded each of them unless knowingly and understandingly waived." (Italics mine.)

State trial courts, confronted daily as they are with the tragic problems of mental illness cases, cannot luxuriate in legal abstractions; they are compelled to take care of this urgent business quickly and to provide for the early sequestration and treatment of mentally ill persons, or in the alternative speedily discharge them from custody. In the administration of the mental illness code, trial courts face conditions which have to be dealt with; theirs is the momentous function of providing for the sequestration, detention, protection and custody of the mentally ill or of speedily discharging the subject of the hearing from detention.

The legislature recognized this judicial role, it will be seen, in the enactments now in force and has not, I assume, sought to relieve the courts of these responsibilities in those statutes soon to supersede them, Laws of 1973, 1st Ex. Sess., ch. 142, p. 1014, effective January 1, 1974, and a newer statute already substantially amending the latter statute before its effective date, Laws of 1973, 2d Ex. Sess., ch. 24, p. 59. In neither statute, however, has the legislature intended to make the waiver of jury trial obsolete. All of the current legislation in effect at the time of this case made it procedurally possible to avoid the inevitable anguish, distress and mental damage frequently produced by militant adversary contests in mental illness trials.

Accordingly, the statutes in force at the time of the instant application prescribe that applications for involuntary

hospitalization begin, not by claim, complaint, information or indictment, but in the blandest of all possible ways—by application, as in probate matters. RCW 71.02.110. With the filing of this application for involuntary hospitalization under oath (RCW 71.02.090), under the existing statutes due process of law sets in, for the *court* and not administrative officers must issue an order for setting a date for hearing and examinations. Emergencies are provided for, if necessary, "to safeguard the lives and property of the alleged mentally ill person." The court shall direct that the persons "be immediately apprehended and detained for care, treatment and custody pending hearing and examination." RCW 71.02.120. That the superior court has constitutional duties and powers in mental illness cases is undoubted. *State ex rel. Richey v. Superior Court,* 59 Wn.2d 872, 371 P.2d 51 (1962).

Early safeguards against the abuse of process are set up in statutes in force at the time of the instant application. Before the application for involuntary hospitalization could even be filed, the prosecuting attorney or another designated to do so by the court, had to make an endorsement on it showing that the patient had been personally examined, that the applicant for the order queried, and that the examiner had "investigated the merits of the application and believes reasonable grounds exist for filing the same." RCW 71.02.090.

Statutes now in force, and presumably those to be in force after January 1, 1974, contemplate that the atmosphere and psychology of the mental illness proceedings shall be clinical—not penal. The stark trappings of the courtroom, the jailhouse, and adversary trial are to be avoided. Persons detained pursuant to court order for examination must be taken to hospital-type facilities. RCW 71.02.130. Judicial process is always provided. Notice of hearing on the application for involuntary hospitalization must be given by the clerk of the superior court to the guardian, spouse or next of kin of the allegedly mentally ill person and upon the patient unless the court finds that such

notice might be injurious to the patient in which case it must be served upon the guardian ad litem. RCW 71.02.140. If the patient has no guardian, the court shall appoint a guardian ad litem for him; there must be a hearing before a judge of the superior court, with the general public excluded unless the patient's guardian, attorney, or guardian ad litem demands an open hearing, or unless a jury is demanded. RCW 71.02.160.

At least two examining physicians must be appointed by the court and they must file "a written report of the facts and circumstances upon which their testimony is based," and state their conclusions in writing as to whether or not the patient is mentally ill. RCW 71.02.170. There must be a guardian ad litem and the patient has the right to be represented by counsel if he wishes. Finally, before the court can properly order involuntary commitment and treatment, it must find that the allegedly mentally ill person is suffering from psychosis or other disease impairing his mental health, the symptoms of which are of a suicidal, homicidal or incendiary nature, or of a kind which makes the patient dangerous to himself or to the lives and property of others. Only after this detailed procedure and with all of these safeguards can the court order hospitalization—unless, of course, a jury is demanded. RCW 71.02.200-210. In either event, whether to court or jury, the trial is a civil proceeding and not a criminal one. *State ex rel. Richey v. Superior Court, supra.*

While the courts must exercise constant vigilance that procedures for involuntary hospitalization are employed neither to deprive one of his freedom for insubstantial, illusory and transient reasons nor to compel confinement where none is medically warranted under law, they are, nevertheless, not required to view applications for involuntary hospitalization with suspicion and treat them as prima facie attempts to deprive the person whose hospitalization is sought as a victim either of personal malice or rampant police power. A patient, in person, or by guardian ad litem, or through counsel, has every right to waive trial by jury,

and if it appears to the court that trial by jury in the patient's best interest be waived and his personal representative so indicates, this court ought not construe the mental illness statutes so that either counsel or guardian ad litem are fearful of being held to a breach of duty in declining to demand a jury trial.

Even in criminal cases, a jury trial or a trial itself may be waived (*State v. Kratzer,* 70 Wn.2d 566, 424 P.2d 316 (1967)); and so, too, may the right to counsel. One may plead guilty with or without the advice and assistance of counsel and where the accused's decision is competently made and entirely voluntary he may refuse to accept the appointment of counsel. For a statistical table of the percentages of pleas of guilty entered in the courts functioning in twelve of the nation's largest cities, *see* P. DonVito, *An Experiment in the Use of Court Statistics,* 56 *Judicature* 56, 61 (1972).

Accordingly, in the instant case when the guardian ad litem wrote upon the jury demand that he, "In the best interests of the patient and in her behalf . . . do[es] not request or permit a jury demand" there is a strong presumption that he acted in the best interests of the patient, and there is no stigma whatever to be attached to this action. That this court now overrides that waiver to direct a jury trial as requested by the patient's private counsel does not imply either that the guardian ad litem's waiver of or the attorney's demand for a jury trial were contrary to the plaintiff's best interest. All that the court's opinion here should be deemed to hold is that both actions were sincerely and responsibly undertaken for the patient's welfare and that where there is an ambivalence between court-appointed guardian ad litem and private counsel with respect to trial by jury, the views of the latter should prevail even though that decision ultimately may turn out not to be in the patient's best interests.

HUNTER and HAMILTON, JJ., and RUMMEL, J. Pro Tem., concur with HALE, C.J.