71 Cal.App.3d 277 (1977)
139 Cal. Rptr. 357
Conservatorship of the Person and Estate of BRAD K. CHAMBERS.
MICHAEL G. IOAKIMEDES, as Public Guardian, etc., Petitioner and Respondent,
v.
BRAD K. CHAMBERS, Objector and Appellant.
In re BRAD K. CHAMBERS on Habeas Corpus.
Docket Nos. 39978, 16233.
Court of Appeals of California, First District, Division Two.
June 29, 1977.
*279 COUNSEL
Jonathan S. Chasan for Objector and Appellant and for Petitioner.
Milton Goldinger, County Counsel, and Thomas H. Gordinier, Deputy County Counsel, for Petitioner and Respondent and for Respondent.
OPINION
TAYLOR, P.J.
In No. 39978, Brad Chambers (hereafter Chambers) appeals from an order granting the petition for appointment of a conservator, on the ground that he is gravely disabled as a result of a mental disorder, pursuant to the provisions of the Lanterman-Petris-Short Act (hereafter LPS);[1] in Criminal No. 16233, Chambers seeks[2] a writ of habeas corpus in this court to obtain release from his allegedly unlawful confinement. In both of these consolidated proceedings, the major contentions are that: 1) the statutory definition of "gravely disabled," absent a finding of dangerousness as demonstrated *280 by an overt act, is an unconstitutionally vague and overbroad standard;[3] 2) Chambers' waiver of the right to a jury trial on the issue of his "grave disability" was constitutionally deficient. For the reasons set out below, we have concluded that the order appointing the conservator should be affirmed, and the petition for the writ of habeas corpus denied.
As the facts are not in dispute, a brief summary will suffice. Chambers, a life-long resident of Vallejo, California, was 24 years old at the time of the initiation of these proceedings on April 8, 1976. He did poorly in school and had been sporadically employed since his graduation from high school; he frequently quit or was fired for absenteeism and inability to complete tasks. In 1973, he worked as a laborer for nine months, but since that time has made little effort to find employment or vocational training.
At the age of 15, he began to drink and reportedly consumed about 36 ounces of beer daily; as an adult, he had been arrested numerous times for drunkenness. Since the age of 19, he reportedly had taken LSD 35 times and had also ingested mescaline, marijuana, methedrine and heroin.
Chambers had six previous admissions to Napa State Hospital (hereafter Napa). His first admission to Napa on January 23, 1973, was the result of a suicide attempt; his subsequent admissions were due to bizarre, violent and destructive behavior, excessive drinking, and failure to respond to and take advantage of treatment available to him at community health services.
After his discharge from several hospitalizations in 1974 and 1975, Chambers unsuccessfully attempted to live independently; each attempt resulted in readmission to Napa. After his discharge on February 23, 1976, he returned to live with his mother and apparently spent his time sleeping, eating, watching television and frequently using drugs and alcohol. On the night of March 23, 1976, his mother flushed his prescribed medications down the toilet because she felt that the medications were making him extremely lethargic. Thereafter, Chambers pushed and punched her. His mother called the police and again he *281 was admitted to Napa pursuant to section 5150, his third admission in 1976. His condition was diagnosed as a type of chronic undifferentiated schizophrenia.
Chambers' mother indicated that he could no longer live with her, as their argument about the medication and his violence led to physical abuse toward her. From ages 8 to 17, Chambers lived with his father and step-mother; however, his father indicated that he gets along better with his son when they do not live together.
By order dated April 7, 1976, the superior court appointed a temporary conservator pursuant to section 5352. By petition filed April 8, 1976, request was made for the appointment of a conservator of the person and estate of Chambers. The petition was accompanied by an affidavit from a Napa staff psychiatrist, setting forth the diagnosis. It related Chambers' inability to provide for his basic personal needs, unwillingness or inability to voluntarily accept treatment and need for supervision. The psychiatrist opined that Chambers was gravely disabled as a result of the severe nature of his mental illness. The conservatorship investigation report filed with the court on April 27, 1976 (§ 5354) set forth the facts summarized above and recommended a conservatorship, as Chambers was gravely disabled as a result of a mental disorder (§ 5350 et seq.). After consulting with his counsel, Chambers waived an adversary hearing and agreed to be bound by the decision of the court (§ 5350 subd. (d)). The court granted the petition on May 5, 1976; the order appointing the conservator was filed on May 7, 1976. At the present time, Chambers is confined at the direction of his conservator at the Petaluma Care and Guidance Center.
(1) Chambers first argues that the standard of "gravely disabled," as defined in section 5008,[4] is unconstitutionally vague and overbroad as it purports to provide for the incarceration of individuals who have committed no overt act demonstrating dangerousness to themselves or others. Chambers' contention is based on several recent challenges to the civil commitment statutes of other jurisdictions: He relies on authorities which permitted commitment for an indefinite period and did not provide for: 1) the presence of the individual at the commitment hearing; 2) representation by counsel; 3) advisement of the evidence or *282 charges; and 4) a jury trial. In each instance, the constitutional challenges to the civil commitment proceedings were upheld on grounds of vagueness or overbroadness in language or failure to provide for certain rights required to afford due process. In these cases, the courts held that civil commitment requires a finding that an individual be an immediate danger to himself or to others, as evidenced by an overt act (Bell v. Wayne County General Hospital at Eloise, 384 F. Supp. 1085; Lessard v. Schmidt, 349 F. Supp. 1078, vacated and remanded on other grounds, 414 U.S. 473 [38 L.Ed.2d 661, 94 S.Ct. 713]; Lynch v. Baxley, 386 F. Supp. 378).
In the field of mental health, state Legislatures have had to choose between "the medical objectives of treating sick people without legal delays and the equally valid legal aim of insuring that persons are not deprived of their liberties without due process of law" (The Dilemma of Mental Commitments in California: A Background Document, Subcommittee on Mental Health Services, Assem. Interim Com. on Ways and Means, p. 7 (Nov. 1970)) (hereafter Subcommittee Report). After intensive research, our Legislature incorporated these diverse objectives into the LPS. The statute is designed to provide prompt, short-term, community-based intensive treatment, without stigma or loss of liberty, to individuals with mental disorders[5] who are dangerous to themselves or to others, or who are gravely disabled (Subcommittee Report, supra). Although the LPS is more medically oriented than the former commitment statute, the California Legislature enacted procedural safeguards to protect an individual against erroneous commitment (Thorn v. Superior Court, 1 Cal.3d 666, 674 [83 Cal. Rptr. 600, 464 P.2d 56]).
The professional person in charge of an LPS evaluation or treatment facility may recommend the appointment of a conservator for any person he determines is gravely disabled as a result of a mental disorder and who is unwilling or incapable of voluntarily accepting treatment (§§ 5350, 5352). A comprehensive investigation report containing all relevant information pertaining to the patient's medical, psychological, social, family, vocational and financial condition, must be prepared before the hearing (§ 5354). Conservatorship will be recommended only when there are no suitable alternatives available (§ 5354). The citation and a copy of the petition must be served upon the proposed conservatee *283 at least 10 days before the hearing date (Prob. Code, § 1754).[6] Where appropriate, the petition must specifically request that the proposed conservatee be deprived of his right to enter contracts and be denied the use of a driver's license (§ 5357).
Within 30 days from the date of the filing of the petition, a hearing must be held and the proposed conservatee must have counsel appointed within five days after the date of the petition (§ 5365).[7] The proposed conservatee, on the advice of counsel, can demand a court or jury trial on the issue of grave disability, thereby waiving the hearing, or he can proceed with the hearing and be bound by the decision of the court (§ 5350, subd. (d)). On the advice of counsel, the proposed conservatee may waive the presence of the professional person who urged conservatorship, and the medical records and recommendation may be entered into evidence (§ 5365.1).
Upon the establishment of a conservatorship, the conservatee may be placed in an approved medical or nonmedical facility pursuant to the court order. Family placement with outpatient treatment is preferred (§ 5358.6); if the conservatee cannot remain at home, or be placed with relatives, great care must be taken to place him in a suitable facility as close as possible to his home or that of a relative (§ 5358). To insure short-term commitment, the conservatorship automatically terminates at the end of one year. The conservator may be appointed for an additional one-year period but the petition must include the opinion of two physicians that the conservatee is still gravely disabled as the result of a mental disorder. When the conservatorship terminates, any facility in which the conservatee has been placed must release him (§ 5361). Additionally, the conservatee may request a rehearing every six months (§ 5364). A former conservatee shall not be presumed to be incompetent (§ 5368).
Thus, the statutes enumerate the rights of the conservatee, provide procedural due process, and insure that the conservatee will not be civilly committed for a period exceeding the disability. Unlike the civil *284 commitment proceedings of other jurisdictions cited by Chambers, the LPS has carefully distinguished between persons who are suicidal, imminently dangerous to others,[8] and persons, like Chambers, who are gravely disabled. Only the LPS provisions governing the involuntary confinement of individuals who, as a result of a mental disorder, are dangerous to themselves (§§ 5260-5264) or others (§§ 5300-5304), require an overt act of dangerousness and proof that further acts of dangerousness are imminent.[9]
As a basis for commitment of nondangerous individuals like Chambers, who are "gravely disabled," the statutory standard requires proof that an individual, as a result of a mental disorder, is unable "to provide for his basic personal needs for food, clothing, or shelter" (§ 5008, subd. (h)). California's recognition of the distinction between the two types of conservatees is viewed with favor by some commentators, although the entire field of mental health law is still an emerging and controversial one (see Development in the Law of Civil Commitment of the Mentally Ill, 87 Harv.L.Rev. 1190-1406; 1, No. 2, Mental Disability L. Rep. (Sept.-Oct. 1976) at pp. 160 and 164).
The enactment of the LPS and with it the substitution of "gravely disabled" for "in need of treatment"[10] as the basis for commitment of individuals not dangerous to themselves or others reflects a legislative determination to meet the constitutional requirements of precision.[11] The term "gravely disabled" is sufficiently precise to exclude unusual or nonconformist lifestyles. It connotes an inability or refusal on the part of the proposed conservatee to care for basic personal needs of food, clothing and shelter. It also provides fair notice of the proscribed conduct to the proposed conservatee who must be presumed to be a person of common intelligence for the purpose of determining the sufficiency of the statute.
*285 As a result of the procedural safeguards provided in "gravely disabled" conservatorship proceedings, the deliberate distinction between the dangerous and nondangerous mentally ill, the short-term nature of civil commitment and the provision for automatic review, it is not necessary for us to impose a substantive requirement of dangerousness to self or others or additional due process protections into the LPS to protect potential conservatees, as did the courts in the cases cited by Chambers. We hold that in the context of the LPS, the gravely disabled standard is constitutionally precise and, as it requires a causal link between a specifically defined and diagnosed mental disorder and an inability to care for one's basic personal needs, the term is neither vague nor overbroad.
Nor can we agree with Chambers that the authorities he cites require us here to reach the difficult question of whether the state should compulsorily confine a nondangerous mentally ill individual[12] for the purpose of treatment (cf. O'Connor v. Donaldson, 422 U.S. 563, 572 [45 L.Ed.2d 396, 405, 95 S.Ct. 2486]). As Chambers notes, our Supreme Court in People v. Burnick, 14 Cal.3d 306, at pages 326-327 [121 Cal. Rptr. 488, 535 P.2d 352], indicated its awareness of the present "limited state of the art" of the diagnosis of mental disorders by mental health professionals. However, in view of our conclusions on the waiver issue, discussed below, we do not think the instant case is a proper one for reaching the question of the substantive constitutional criteria required for civil commitment.[13]
(2) Chambers next contends that his waiver of the right to a trial on the issue of grave disability was constitutionally deficient, absent an on-the-record voir dire as to each of the due process protections he surrendered. Specifically, he refers to his right to a jury trial and his right *286 to confrontation. In enacting the LPS, our Legislature recognized that civil commitment represents a deprivation of liberty and, therefore, afforded the proposed conservatee all of the due process protections outlined above. Subsequently, it decided to further expand the procedural safeguards of proposed conservatees and require an on-the-record voir dire by the court.[14] Chambers, relying on Boykin v. Alabama, 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709], and In re Tahl, 1 Cal.3d 122, 135 [81 Cal. Rptr. 577, 460 P.2d 449], argues that an on-the-record voir dire is constitutionally required and, therefore, must be applied retroactively. Those cases, even though involving a similar question in criminal proceedings, held an on-the-record voir dire requirement to be prospective only and there is no authority requiring it to be retroactively applied in LPS proceedings.[15] Retroactivity of a rule establishing a new standard for Fourteenth Amendment due process is not automatic. As the United States Supreme Court indicated in Stovall v. Denno, 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967], and Reck v. Pate, 367 U.S. 433 [6 L.Ed.2d 948, 81 S.Ct. 1541], retroactivity depends upon a pragmatic balancing of the public interests against the gravity of the right involved. Thus, if the rule or newly established standard goes to the very integrity of the fact-finding process by which liberty is taken, retroactivity should be accorded, even though it may result in a wholesale reconsideration of the standards by which factual determinations were made. Although our Supreme Court in In re Johnson, 3 Cal.3d 404, 410 [90 Cal. Rptr. 569, 475 P.2d 841], noted and followed the United States Supreme Court's policy of giving retroactive effect to decisions bearing on rights which directly affect the integrity of the fact-finding process, such a policy would not compel this court to hold the on-the-record requirements of new Probate Code section 1754.1 retroactive. The new on-the-record voir dire only *287 indirectly affects the integrity of the fact-finding process to make possible a more effective appellate review of a factual determination (cf. In re Yurko, 10 Cal.3d 857 [112 Cal. Rptr. 513, 519 P.2d 561]; People v. Sanford, 63 Cal. App.3d 952, 957 [134 Cal. Rptr. 155]).
At the time of the instant proceedings, the court was not required to voir dire the proposed conservatee on his rights. Moreover, all of the above enumerated statutory safeguards were available to Chambers. The nature and purpose of the proceeding, his condition, and the need for the conservatorship, were set forth in the petition served on Chambers at least 10 days prior to the initial hearing date. Chambers was represented by an experienced deputy public defender, who was well aware of his obligation to protect procedural due process rights. In re Tahl, 1 Cal.3d 122, 128 [81 Cal. Rptr. 577, 460 P.2d 449], indicates that the presence of counsel may be the crucial factor in determining the propriety of a waiver of rights that should be protected by counsel. When counsel is present, a voluntary and intelligent waiver of known rights may properly be inferred from the record, without a specific on-the-record showing as to each right. The record here indicates that Chambers had two separate conferences with his counsel[16] and knew of his right to request an adversary proceeding.[17] Thereafter, counsel indicated to the court in Chambers' presence that his client had agreed to submit the question of his grave disability to the court solely on the petition and affidavits. Counsel also stated that Chambers had been informed that even if the court granted the conservatorship that morning, he would have five days in which to file a motion for a trial if he wished to do so, but at that moment did not wish to file such a motion. We hold that under these circumstances, pursuant to the statutory procedure in effect at the time of the instant commitment proceeding, the trial court was not required to make a more searching inquiry after being informed by counsel in Chambers' presence that he had waived his rights. The court was entitled to conclude that there was a voluntary and knowing waiver. Our resolution of this question makes it unnecessary for us to consider Chambers' contentions as to whether and when he was entitled to assert his Fifth Amendment right to remain silent.
However, we feel constrained to briefly comment on an issue not addressed by either party, namely, the threshold question of Chambers' *288 capacity to comprehend the nature of the proceedings and the effect of a waiver on his basic rights. As our Supreme Court observed in Thorn v. Superior Court, supra, 1 Cal.3d at page 675, "Absent an understanding by the patient of the nature of his detention and of his rights, it is difficult to perceive how he could knowingly decide whether or not to exercise them." We think that proceedings of this kind should be scrutinized to ascertain at the outset whether the proposed conservatee had sufficient understanding of the situation in order to make an intelligent, knowing and voluntary waiver. Our view is supported by our Supreme Court's statement in Board of Regents v. Davis, 14 Cal.3d 33, at page 39 [120 Cal. Rptr. 407, 533 P.2d 1047], that the conservatorship statutes were designed to cover a much more extensive category of persons than the guardianship statutes, and certain provisions of the LPS, discussed above.
We think that the following aspects of the record before us demonstrate that such a threshold determination was properly made here as to Chambers. Chambers' presence at the hearing[18] indicates that the psychiatrist did not think that his mental disability prevented his participation in, and understanding of, the hearing. Chambers was observed by the court, and more closely by the public defender, who had a more extensive opportunity to weigh his behavior and confer with him about his rights. We conclude that Chambers' waiver of his right to a trial on the issue of grave disability was voluntary, knowing and intelligent, and was not constitutionally defective for lack of an on-the-record voir dire.
The order appointing the conservator is affirmed and the writ of habeas corpus is denied.
Rouse, J., concurred.
KANE, J.
While I concur with the views expressed and the result reached by my colleagues. I feel compelled to voice my concern for the *289 impending, and in my opinion wholly unwarranted, application of procedural requirements a la Boykin v. Alabama, 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709], and In re Tahl, 1 Cal.3d 122, 135 [81 Cal. Rptr. 577, 460 P.2d 449], to conservatorship proceedings under the Lanterman-Petris-Short Act (hereafter LPS).
As noted in the main opinion (ante, p. 286, fn. 14), under Probate Code section 1754.1, effective July 1, 1977, the court will be required to conduct a "voir dire" examination of the proposed conservatee, including an explanation "as to the nature and purpose of the proceeding, that the appointment of a conservator for his person and estate or person or estate is a legal adjudication of his inability properly to provide for his personal needs or manage his own financial resources or of his incompetency, the effect of such an adjudication on his basic rights, the identity of the person who has been nominated as his conservator, that he has right to oppose such proceeding, to have the matter tried by jury, and to be represented by legal counsel if he chooses. After communicating such information to the person and prior to the appointment of his conservator, the court shall consult the person to determine his opinion concerning the appointment." (Italics added.)
It seems to me that no one has considered the fact that in a great number of these cases, the proposed conservatee is totally incapable of understanding anything at all, let alone an explanation of complicated legal rights, duties, and consequences. Certainly a valid waiver of one's LPS rights cannot be obtained from a person who is so gravely disabled as to be unable to understand what the court is saying. What does the court do in such a case? The statute is silent; consequently, it would appear that in such a case the court's only alternative will be to deny the petition, thereby leaving the proposed conservatee unprotected and uncared for.
It seems to me that in this area of the law, a person's rights can be more effectively protected by representation of counsel who should be empowered to either assert or waive the proposed conservatee's due process rights. To that end the Legislature, in my opinion, should quickly reconsider and repeal Probate Code section 1754.1 before it yields the harvest of mischievous results which are sure to follow.
A petition for a rehearing was denied July 29, 1977, and appellant's petition for a hearing by the Supreme Court was denied August 25, 1977.
NOTES
[1] Welfare and Institutions Code section 5000 et seq., (Stats. 1967, ch. 1667, p. 4074, operative July 1, 1969). All statutory references are to the Welfare and Institutions Code unless otherwise stated.
[2] Although Chambers did not seek the writ below, he asks that we exercise original jurisdiction. As he is restrained of liberty and is attacking the constitutionality of a statute, we assume, for the purposes of discussion, that the remedy is appropriate (In re Rinegold, 13 Cal. App.3d 723 [92 Cal. Rptr. 18]).
[3] A similar issue was raised and rejected by this court in Conservatorship of Turner (Civ. No. 38400) in which we granted a rehearing and deferred submission pending the state Supreme Court's decision in Conservatorship of Roulet, (L.A. No. 30730; hg. granted Feb. 3, 1977). However, the question in Roulet (as well as several other LPS cases presently pending before our Supreme Court) is whether the civil or criminal standard of proof applies to LPS proceedings.
[4] The statute, so far as pertinent, provides: "(h) For purposes ... of this part, `gravely disabled' means:

"(1) A condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter."
[5] The term "mental disorder" is limited to those disorders listed by the American Psychiatric Association in its Diagnostic and Statistical Manual of Mental Disorders (Cal. Admin. Code, tit. 9, § 813).
[6] The LPS provides for the establishment, administration and termination of conservatorships for gravely disabled persons in the same manner as set forth in division 5 (commencing with § 1701) of the Probate Code (§ 5350). Probate Code section 1702 further provides that where procedures are not specifically established pursuant to Probate Code section 1701 et seq., then the provisions of Probate Code section 1400 et seq. apply.
[7] If the proposed conservatee is financially unable to employ counsel, the public defender is appointed (Gov. Code, § 27706, subd. (d)).
[8] The LPS provides for intensive treatment of suicidal persons (§ 5260 et seq.): for postcertification procedures for persons imminently dangerous to others (§ 5300 et seq.); for conservatorship appointments for gravely disabled persons (§ 5350 et seq.).
[9] Chambers concedes that if his conservatorship had been based on this portion of the LPS, it would be proper and not subject to constitutional challenge.
[10] Former division 5, repealed by Statutes of 1967, chapter 1667, page 4055, section 34.5, operative July 1, 1969.
[11] The constitutional standard for vagueness has been stated as follows: "... a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law" (Connally v. General Const. Co., 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126]).
[12] The thrust of this argument is that with the exception of those conditions that can be traced to organic sources, the mental disorders, as defined by the LPS (see fn. 5, ante), are "ultimately defined by behaviorial deviations from the social norm." and therefore inherently subjective. Accordingly, many mental health professionals and legal commentators argue that mental disorders, as presently defined, are so vague and unclear as a medical concept that they should not be used as a basic legal criterion in a proceeding entailing the deprivation of liberty. Like Chambers, the largest category of mental patients are diagnosed as schizophrenics (see 87 Harv.L.Rev. 1254-1257; In re Ballay (1973) 482 F.2d 648, 658, dictum at p. 665 [157 App.D.C. 59]).
[13] Chambers contends that a psychiatric finding of grave disability is, by itself, insufficient to justify involuntary hospitalization and that evidence of recent conduct of self-neglect is required. Evidence Code section 801, subdivision (b), provides that an expert may base his testimony upon any matter which is a type upon which the expert may reasonably rely in forming an opinion. There is no requirement of direct knowledge of given facts (Rosenberg v. Goldstein, 247 Cal. App.2d 25 [55 Cal. Rptr. 306]).
[14] Probate Code section 1754.1, effective July 1, 1977, so far as pertinent, requires the court to "... inform the proposed conservatee as to the nature and purpose of the proceeding, that the appointment of a conservator for his person and estate or person or estate is a legal adjudication of his inability properly to provide for his personal needs or manage his own financial resources or of his incompetency, the effect of such an adjudication on his basic rights, the identity of the person who has been nominated as his conservator, that he has right to oppose such proceeding, to have the matter tried by jury, and to be represented by legal counsel if he chooses. After communicating such information to the person and prior to the appointment of his conservator, the court shall consult the person to determine his opinion concerning the appointment." (Added by Stats. 1976, ch. 1357, § 27.)
[15] We do not find persuasive either Heryford v. Parker, 396 F.2d 393, or Quesnell v. State (1974) 83 Wn.2d 224 [517 P.2d 568], cited by Chambers, as supporting his contention that the Boykin-Tahl standards should apply. In Heryford, supra, the person committed was not represented by counsel and the court held he had been deprived of due process; in Quesnell, supra, the waiver was made by the guardian instead of the individual involved and the court held the waiver of a jury trial ineffective without the knowing consent of the patient.
[16] Chambers has raised no questions concerning the competency of his counsel. We are aware of the difficulties of and current debate about the proper performance and role of counsel in commitment proceedings (see 87 Harv.L.Rev., supra, at pp. 1284-1291).
[17] When a proposed conservatee demands a trial on the issue of grave disability, he has the right to confront witnesses, produce evidence, refuse to testify, and all other civil trial rights.
[18] Probate Code section 1754 provides, so far as pertinent: "The proposed conservatee, if he is the petitioner, or if he is in the state at date of service and, if able to attend, shall be produced at the hearing, and, if not able to attend by reason of medical inability, such inability shall be established by the affidavit or certificate of a duly licensed medical practitioner."