OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

---

|  | : |  |
| OPINION | : | No. 88-1001 |
|  | : |  |
| of | : | MARCH 29, 1989 |
|  | : |  |
| JOHN K. VAN DE KAMP | : |  |
| Attorney General | : |  |
|  | : |  |
| CLAYTON P. ROCHE | : |  |
| Deputy Attorney General | : |  |
|  | : |  |

---

THE HONORABLE GARY K. HART, MEMBER OF THE CALIFORNIA STATE SENATE, has requested an opinion on the following questions:

1. May persons over 21 years of age suffering from Alzheimer's disease, brain injuries or other organic brain disorders be eligible for evaluation and treatment under section 5150 of the Welfare and Institutions Code?

2. If such individuals are eligible for evaluation and treatment under section 5150 of the Welfare and Institutions Code, may Short-Doyle funds or state hospital facilities be made available to counties to provide such services?

CONCLUSIONS

1. Persons over 21 years of age suffering from Alzheimer's disease, brain injuries or other organic brain disorders may fall within the scope of section 5150 of the Welfare and Institutions Code and be eligible for evaluation and treatment if as a result thereof they are a danger to themselves or others or are gravely disabled.

2. Short-Doyle funds or state hospital facilities would be legally available for the provision of evaluation and treatment services to such individuals.

ANALYSIS

Section 5150 of the Welfare and Institutions Code[1], a provision of the Lanterman-Petris-Short Act (§ 5000 et seq.) provides in part as follows:

---

1. All section references are to the Welfare and Institutions Code unless otherwise indicated.

"When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation. . . ."

Accordingly, an individual may be apprehended and detained in a county designated facility for 72 hours if (1) that person is either "a danger to others, or to himself or herself" or "gravely disabled" and (2) the danger or disability is the result of a "mental disorder." This 72 hour evaluation may lead to further detention for treatment of periods of 14 days, 30 days, and 180 days. (See §§ 5250 et seq.; 5260 et seq.; 5270 et seq.; 5300 et seq.)

We are asked first whether persons over 21 years of age suffering from Alzheimer's disease, brain injuries or other organic brain disorders may fall within the scope of section 5150. We understand the first question to ask whether organic brain disorders are "mental disorders" within the meaning of section 5150. We do not understand the question to ask whether organic brain disorders cause a person to be dangerous to himself or others. The latter question is a question of fact to be determined in each case.[2]

In 1967 the Legislature repealed much of the then existing Welfare and Institutions Code relating to the care and treatment in state hospitals of persons who were mentally ill. In lieu thereof, the Legislature enacted the Lanterman-Petris-Short Act, section 5000 et seq., which became fully operative on July 1, 1969. That law had as its general purpose the termination of most involuntary commitments to mental hospitals in the state, with the cases thereafter being handled through community mental health programs and facilities established pursuant to the Short-Doyle Act, section 5600 et seq. (See Stats. 1967, Ch. 1667, p. 4074 et seq; Stats. 1968, ch. 989, p. 1912 et seq.) With this new act, a major change in terminology occurred from the previous term "mental illness" to the use of the newer term "mental disorder." The new law did not nor does it yet define the term "mental disorder" for purposes of the Welfare and Institutions Code. Accordingly, our task herein is to attempt to define the scope of the term for purpose of section 5150 and allied sections.

Evidence of legislative intent in this respect is found in the legislative report which immediately preceded the enactment of Lanterman-Petris-Short. (See "The Dilemma of Mental Commitments in California: A Background Document, Subcommittee on Mental Health Services, Assem. Interim Com. on Ways and Means (Nov. 1966), hereinafter, "Subcommittee Report.") This Subcommittee Report has been utilized by the courts in discussing the purpose and intent of Lanterman-Petris-Short. (See, e.g., *Thorn* v. *Superior Court* (1970) 1 Cal.3d 666, 668; *Riese* v. *St. Mary's Hospital and Medical Center* (1987) 196 Cal.App.3d 1388, 1400, fn. 8; *Conservatorship of Chambers* (1977) 71 Cal.App. 3d 277, 282.

2. We note that the law does not define the conduct which would cause a person to be considered a danger to himself or herself or others. It does, however, define the term "gravely disabled" for adults in section 5008, subdivision (h) (1) as "[a] condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter."

For the definition of a "gravely disabled minor," see section 5585.25, contained in the just enacted "Children's Civil Commitment and Mental Health Treatment Act of 1988, sections 5585 et seq.

An examination of the Subcommittee Report leads to the conclusion that the term "mental disorder" in the present law was basically intended as the equivalent of the term "mental illness" in the old law. The two terms are used interchangeably throughout the report, and sometimes both terms may even be found in the same sentences as equivalents. (See, e.g., Subcommittee Report, pp. 80, 84-106.) It is probable that the term mental disorder was substituted for the term mental illness throughout the Welfare and Institutions Code to provide more precision in the new statute and to adopt the scientific terminology used by mental health practitioners. As stated in the Subcommittee Report (at p. 14):

"As operating concepts, 'mental illness' and 'services for the mentally ill' are not sufficiently precise for legislative planning purposes. These nonspecific concepts have influenced the development of the Department of Mental Hygiene, our state hospital system, the court commitment process, and a body of laws which do not seem appropriate in the light of present knowledge. Henceforth, planning should be done in terms of specific objectives for defined groups with particular problems." (Emphasis in original.)

Additionally, the change in terminology had the effect of eliminating the stigma which had attached to the term "mental illness." This was of some concern to the legislative subcommittee. As stated in the Subcommittee Report (at p. 15): "[t]he nondescriptive term 'mental illness' not only serves to group a variety of dissimilar problems into a single medical mold, but it also seems to carry a connotation of danger."
(See also discussion in *Conservatorship of Chambers*, *supra*, 71 Cal.App.3d at p. 282.)

Since the Subcommittee Report uses the term "mental illness" and "mental disorder" interchangeably, the definition of the term "mentally ill persons" found in the Welfare and institutions Code when the Subcommittee Report was prepared is significant to our inquiry. At that time, section 5550 provided:

"'Mentally ill persons' as used in this code, means persons who come within either or both of the following descriptions:

"(a) Who are of such mental condition that they are in need of supervision, treatment, care or restraint.

"(b) Who are of such mental condition that they are dangerous to themselves or to the person or property of others, and are in need of supervision, treatment, care, or restraint.

"Whenever in this code the term 'insane' or its variants are used, such terms shall be construed to refer to and mean 'mentally ill' or its variants, as defined in this section."[3/]

---

3. Although not discussed in the Subcommittee Report, we note that in 1965 the term "mentally disordered" may be found in the Welfare and Institutions Code as or describing persons who were less than "mentally ill." Thus section 5568 the code provided:

"If, on the examination as provided by law, the court finds a person to be mentally disordered and bordering on mental illness but not dangerously mentally ill, the court may commit him to the care and custody of the counselor in mental health and may allow him to remain in his home subject to the visitation of a

Thus, in 1966 the law made no distinction between mental conditions which were of organic or nonorganic origin, or even of unknown origin.

Likewise, the Subcommittee Report evidences an understanding by the legislative subcommittee that the origin of the "mental illness" or "mental disorder" was irrelevant in deciding whether a person suffered from a such a condition. In response to the question posed, "What Is A Mental Illness" the Subcommittee Report states: (at pp. 9-10):

"The term 'mental illness' is a nonscientific, generalized, popular label used to explain or describe a wide range of behavior which is considered 'peculiar' or 'sick', or 'objectionable.'

"The behavior called 'mental illness' is believed to result from three main causes:

"a. CERTAIN PHYSICAL DISORDERS, TOXIC CONDITIONS, OR INJURIES CAN AFFECT THE BRAIN AND A MALFUNCTIONING BRAIN MAY ALTER BEHAVIOR. (Some behavior called mental illness is a symptom of disease. Just as some people have sick hearts or kidneys, others are literally "sick in the head.")

"b. PERSONALITY CHARACTERISTICS CAN INFLUENCE BEHAVIOR. (Some behavior called mental illness can also be considered as a special kind of learning problem. Some people have had personal experiences which have 'taught' them to relate to other people in peculiar or objectionable ways.)

"c. ENVIRONMENTAL PRESSURES--SUCH AS PROLONGED DEPRIVATION, BATTLEFIELD PRESSURE, SUDDEN CHANGES FROM RURAL TO URBAN LIVING--CAN PRODUCE ATTITUDES AND STYLES OF BEHAVIOR WHICH DIFFER FROM THE NORM. (Some behavior labeled as mental illness results from people's reactions to cultural, economic, or other environmental pressures.)"

Thus, for purposes of Lanterman-Petris-Short, the Subcommittee Report contains strong evidence of legislative intent that the term "mental disorder" was intended to encompass virtually any abnormal mental condition, whether of organic, nonorganic, or of unknown cause.

This conclusion is also bolstered by the administrative construction of Lanterman-Petris-Short for over a decade by the then Department of Mental Hygiene.

On August 7, 1970 that Department adopted its administrative regulation in title 9, section 814 of the California Administrative Code setting forth a definition of "mental disorder" for purposes of the Lanterman-Petris-Short Act. That section originally read:

---

counselor in mental health and subject to return to the court for further proceedings whenever such action appears necessary or desirable; or the court may commit him to be placed in a suitable home, sanitarium, or rest haven home, subject to the supervision of the counselor in mental health and the further order of the court."

See also prior section 5577. This clearly is not the sense in which the Subcommittee Report uses the term "mental disorder."

"814. Mental Disorder. For the purpose of Division 5 of the Welfare and Institutions Code, 'mental disorder' means any of the mental disorders as defined in the Diagnostic and Statistical Manual of Mental Disorders (2nd Edition) of the American Psychiatric Association, Sections 290 to 294, inclusive, Sections 295 to 298, inclusive, Sections 300 to 304, inclusive, and Section 308." (See Cal. Admin, Register 70, No. 32, 8-8-70.)

Effective July 29, 1971 this provision of the California Administrative Code was renumbered and amended to read:

"813. Mental Disorder. For the purpose of Division 5 of the Welfare and Institutions Code, 'mental disorder' means any of the mental disorders as set forth in the Diagnostic and Statistical Manual of Mental Disorders (Current Edition) of the American Psychiatric Association." (See Cal. Admin. Register 71, No. 27-C, 7-3-71.)

Finally, the above quoted provision was repealed in 1985, again leaving the term "mental disorder" without a definition in the law for purposes of the Lanterman-Petris-Short Act. (See Cal. Admin Register 85, No. 26, 6-3-85.)

The Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association (commonly known as DSM-I, DSM-II, DSM-III and DSM-III-R through its various revisions) basically presents a uniform nomenclature and definition of terms for use by psychiatrists, and others with respect to "mental disorders" (See, e.g., p. viii of the Forward to DSM-II). DSM I was issued in 1952; DSM-II in 1968; DSM-III in 1980 and DSM-III-R in 1987.

In 1970, the Department of Mental Hygiene included as "mental disorders" sections 290-294, 295-298, 300-304 and 308 of DSM-II. An examination of DSM-II discloses that sections 290-294, are in category "II", that is "Organic Brain Syndromes (Disorders Caused by or Associated With Impairment of Brain Tissue Function, emphasis added). These sections constitute a sub-category "II-A," which are "Psychosis Associated With Organic Brain Syndromes," specifically: "Senile and pre-senile dementia" (290); "Alcoholic psychosis" (291); "Psychosis associated with intracranial infection" (292); "Psychosis associated with other cerebral conditions (293); and "Psychosis associated with other physical conditions" (294). The next included sections of DSM-II, that is, sections 295-298, are "Psychosis Not Attributed to Physical Conditions Listed Previously". These include "Schizophrenia" (295); "Major affective disorders" (affective psychoses) (296); "Paranoid states" (297); "Other psychoses" (298). Sections 300-304 set forth "Neuroses" (300) and "Personality Disorders and Certain Other Non-psychotic Disorders" (301-304.) All of the forgoing general mental disorders are also broken down into subclassifications. Section 308 the last referenced section, is "Behavior Disorders of Childhood and Adolescence."

Thus, the DSM-II categories determined by the then Department of Mental Hygiene to be "mental disorders" for purposes of section 5150 and allied sections of the Lanterman-Petris-Short Act included both organic brain disorders such as caused by Alzheimer's disease ("pre-senile dementia", alcoholism (alcoholic psychoses) and other brain disorders of an organic or nonorganic etiology. They were not restricted to nonorganic "mental disorders."

As a general proposition, the contemporaneous administrative construction of a statute is entitled to great weight and will be followed by the courts unless clearly erroneous. (*Amador Valley Joint Union High School District* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245; *Coca Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 921.)

As noted however, Rule 813 defining "mental disorder" was repealed in 1985.  We are advised that it was determined during the course of the review of all provisions of the California Administrative Code by each state agency between 1981 and 1986, as mandated by the Legislature, that the rule did not meet the requisite criteria for administrative regulations.  (See prior Gov. Code, §§ 11349.7 - 11349.8, repealed by Stats. 1987, ch. 1375.)  The deficiencies were (1) the attempt to incorporate by reference the "Current Edition" of outside materials (DSM) without specific reference to a particular edition and (2) the attempt to automatically incorporate changes in such outside materials (DSM) into the rule without following the legal requirements for amending an administrative regulation.  (Ibid.  See also Letter to Director of Mental Health from Office of Administrative Law, dated 2/1/82.)

In our view, however, the repeal of Rule 813 in 1985 does not militate against the weight to be given the prior administrative construction of section 5150 and allied sections.  What is significant to our consideration herein is not what occurred in 1985, but what occurred in 1970 and 1971.  We believe that the action of the then Department of Mental Hygiene in 1970 and 1971 incorporating by reference DSM II and subsequent editions disclosed the understanding by the department of the general intent and purpose of Lanterman-Petris-Short when it was enacted in 1967.  These are 1) that the term "mental disorder" was intended to include mental disorders of either organic or nonorganic origin, and 2) that the term "mental disorder" is essentially a scientific, technical term the meaning of which is not static and which will evolve and change over the years, and hence should received a "progressive construction."  Accordingly, for purposes of Lanterman-Petris-Short the Legislature intended the term "mental disorder" to reflect its current meaning in the medical and psychological community, which meaning will change with the advances of scientific knowledge and understanding.  Thus, the Legislature has essentially adopted the "theory of progressive construction" to operate on the statute. This doctrine permits the general terms of a statute to be given "elastic operation. . . to cope with changing economic and social conditions." (*Estate of Woodward* (1964) 230 Cal.App.2d 113, 119.)

In this respect the most current version of the Diagnostic and Statistical Manual of the American Psychiatric Association, DSM-III-R is instructive.  Generally speaking, it does not attempt to distinguish etiology or cause in defining a "mental disorder."  In defining what is meant by the term, DSM-III-R states in part:

"Mental Disorder.  Although this manual provides a classification of mental disorders, no definition adequately specifies precise boundaries for the concept 'mental disorder' (this is also true for such concepts as physical disorder and mental and physical health).  Nevertheless, it is useful to present a definition of mental disorder that has influenced the decision to include certain conditions in DSM-III and DSM-III-R as mental disorders and to exclude others.

"In DSM-III-R each of the mental disorders is conceptualized as a clinically significant behavioral or psychological syndrome or pattern that occurs in a person and that is associated with present distress (a painful symptom) or disability (impairment in one or more important areas of functioning) or with a significantly increased risk of suffering death, pain, disability, or an important loss of freedom. In addition, this syndrome or pattern must not be merely an expectable response to a particular event, e.g., the death of a loved one.  Whatever its original cause, it must currently be considered a manifestation of a behavioral, psychological, or biological dysfunction in the person.  Neither deviant behavior, e.g., political, religious, or sexual, nor conflicts that are primarily between the individual and society are mental disorders unless the deviance or conflict is a symptom of a dysfunction in the person, as described above." (Introduction at p. xxii, emphasis added.)

And with respect to etiology or cause, DSM-III-R states in part:

> "Descriptive Approach. For some of the mental disorders, the etiology or patho-physiologic processes are known. For example, in the Organic Mental Disorders, organic factors necessary for the development and maintenance of the disorders have been identified or are presumed. Another example is Adjustment Disorder, in which the disturbance, by definition, is a reaction to psychosocial stress.

> "For most of the DSM-III-R disorders, however, the etiology is unknown. Many theories have been advanced and buttressed by evidence-not always convincing-attempting to explain how these disorders come about. The approach taken in DSM-III-R is atheoretical with regard to etiology or pathophysiologic process, except with regard to disorders for which this is well established and therefore included in the definition of the disorder. Undoubtedly, over time, some of the disorders of unknown etiology will be found to have specific biological etiologies; others, to have specific psychological causes; and still others, to result mainly from an interplay of psychological, social and biological factors.

> "The major justification for the generally atheoretical approach taken in DSM-III and DSM-III-R with regard to etiology is that the inclusion of etiologic theories would be an obstacle to use of the manual by clinicians of varying theoretical orientations, since it would not be possible to present all reasonable etiologic theories for each disorder. . . . In any case, clinicians and researchers can agree on the identification of mental disorders on the basis of their clinical manifestations without agreeing on how the disturbances come about.

> "DSM-III-R can be said to be 'descriptive' in that the definitions of the disorders are generally limited to descriptions of the clinical features of the disorders. The characteristic features consist of easily identifiable behavioral signs or symptoms, such as disorientation, mood disturbance, or psychomotor agitation, which require a minimal amount of inference on the part of the observer. . . ."

Accordingly, the term "mental disorder" as it is understood today is diagnosed from clinical features or manifestations without regard to the necessity of determining their origins, although in some cases these origins may be known or presumed. This approach makes it irrelevant whether a particular psychological syndrome or pattern in an individual is, for example, the product of an organic brain disorder or a nonorganic brain disorder insofar as determining that such individual suffers from a "mental disorder." Significant to our consideration herein however, we still see in DSM-III-R those types of mental disorders specifically alluded to by the requester. For example, under "Organic Mental Disorders" we see "Primary degenerative dementia of the Alzheimer type" both of "senile onset" and "presenile onset" (290.00, 290.20, 290.21, 290.20 290.1).

Accordingly, based upon the evidence of legislative intent available to us from an examination of prior law, the Subcommittee Report and the administrative construction of the statute, we conclude that the term "mental disorder" as used in the Lanterman-Petris-Short Act has been purposely left general and without specific definition so that the definition may evolve with the times. In a field such as psychiatry, which is ever changing, we believe that, absent any such statutory definition or present administrative construction, DSM-III-R or other professional literature could present the proper guidelines for the meaning of the term. The meaning could also be established through expert testimony. This approach is justified under the doctrine of "progressive construction."

In summary on question one, we conclude that persons over 21 years of age who are suffering from Alzheimer's disease, brain injuries or other organic brain disorders can fall within the term "mental disorder" as used in section 5150. Those individuals would, of course, have to not only manifest the requisite clinical features to permit a proper diagnosis of an existing "mental disorder" but would have to additionally be as a result thereof a danger to others, or to themselves, or be "gravely disabled."

The second question presented is whether, if the individuals discussed above can fall within the scope of section 5150, "Short-Doyle funds" or state hospital facilities could be used for their care. We conclude affirmatively as to both the Short-Doyle funds and the state hospital facilities.

The "Short-Doyle Act" (§ 5600 et seq.) was enacted "to organize and finance community mental health services for the mentally disordered in every county through locally administered, and locally controlled community mental health programs." (§ 5600.) "'Mental Health service' means any service directed toward early intervention in, or alleviation or prevention of, mental disorder. . . . (§ 5601, emphasis added). Under state guidelines counties are required to adopt an annual "Short-Doyle Plan" which must include certain elements. (§ 5650 et seq.) "The county plan shall be the basis for [state] reimbursement pursuant to" the Short-Doyle Act. (§ 5650.) Generally, "the net cost of all services specified in the approved county Short-Doyle plan shall be financed on a basis of 90 percent state funds and 10 percent county funds, except for local hospital inpatient costs, which shall be financed on a basis of 85 percent state funds and 15 percent county funds." (§ 5705.)

Nothing in the Short-Doyle Act distinguishes between patients who are suffering from "mental disorders" which are caused by an organic brain dysfunction and those whose "mental disorder" is of a different etiology. Accordingly, Short-Doyle funds would be available for the individuals under consideration in this opinion if they were detained pursuant to the provisions of Lanterman-Petris-Short Act, and as permitted by that act.

As to state hospital facilities, section 5401 provides:

"The State Department of Mental Health may provide a county or combination of counties acting jointly, the evaluation, referral, intensive treatment, prepetition screening, crisis intervention, and other services described in this part.

"No person shall receive treatment in a state hospital pursuant to this section unless the county, or combination of counties has utilized, insofar as practicable, the existing facilities in the county which are subject to reimbursement under the Short-Doyle Act.

"A county of combination of counties receiving services from the State Department of Mental Health pursuant to this section shall pay for such services in an amount not to exceed the actual cost of services. Funds received by the State Department of Mental Health under this section shall constitute a reimbursement to the appropriation from which such cost is expendable and may be used for the purposes of the appropriation.

"Any services provided pursuant to this section shall be included in the county Short-Doyle plan for the county or counties. (Emphasis added)."

"This part" in section 5401 refers to the Lanterman-Petris-Short Act. (§ 5000.) Accordingly, state hospital facilities would be available under section 5401 to any persons receiving care under section 5150 and allied sections for a "mental disorder" without distinction as to whether such "mental disorder" was due to organic brain damage or some other cause.

Thus, in summary on question two, Short-Doyle funds and state hospital facilities are legally available to care for persons over 21 years of age who are suffering from "mental disorders" caused by Alzheimer's disease, brain injuries or other organic brain disorders.

\* \* \* \*