[No. 63389-4.   En Banc.]

Argued January 31, 1996.     Decided June 27, 1996.

THE STATE OF WASHINGTON EX REL. T.B., *Appellant*,
v. CPC FAIRFAX HOSPITAL, ET AL., *Respondents*.

*Mary L. Perdue* of *The Defender Association* and *Daniel S. Gross,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Lee Ann Miller* and *Daniel J. Radin, Assistants; McIntyre & Barns,* by *Mary K. McIntyre* and *Lee M. Barns;* and *Christopher Borland,* pro se, for respondents.

*David Zuckerman* on behalf of the American Civil Liberties Union of Washington and Seattle Displacement Coalition, amici curiae.

SANDERS, J. — The question presented is whether a child may be involuntarily incarcerated in a mental hospital by her parents and hospital staff without judicial oversight. We accepted the Court of Appeals' certification of the child's appeal from the trial court's denial of her petition for writ of habeas corpus. We reverse and order her release from incarceration, or the prospect thereof.

Two primary issues are presented: whether 1995 amendments to the mental health services for minors act, RCW 71.34, also known as the "Becca bill,"[1] allow involuntary incarceration of minors 13 or over in mental hospitals against their will without judicial oversight, and, if so, whether these provisions are constitutional. Our resolution of the first avoids the second. Additionally, we hold this child has suffered an unconstitutional deprivation of her liberty including her right to access counsel and deny cross-motions directed to the style and content of appellate briefs.

The events at issue followed several years of difficulties between 15-year-old T.B. and her parents. It is claimed T.B., while exceptionally bright, periodically experienced temper tantrums and sibling fighting. When T.B. was 12 her family submitted to therapy; however, T.B. was resistant, causing discontinuance of the therapy after six months. Subsequently, T.B. violently fought with her sister and other family members although never to the point of serious injury. Once again the family enrolled in therapy; however, again the child resisted. In 1994, following an argument with T.B., her mother called the county-designated mental health professional (CDMHP) to have T.B. involuntarily committed to a mental hospital;

---

[1]The namesake of the bill, Becca Hedman of Tacoma, was a chronic runaway turned crack addict and prostitute until, at age 13, she was found naked on a river bank, brutally beaten to death.

however, the CDMHP found T.B. was ineligible for commitment because she was a threat neither to herself or others as a result of a mental disorder.

Her performance in school deteriorated as did her behavior. Her parents took away her computer because she often would remain logged on all night, after which she ran away from home and stayed at a friend's house, and then at a youth shelter. Her parents reacted by filing an at-risk youth petition pursuant to RCW 13.32A.191. After failing to appear at a court hearing T.B. was arrested and placed in detention.

T.B. was seen by a psychiatrist, Carl Huffine, M.D.; however, she was uncooperative and left after about 10 minutes. Dr. Huffine concluded T.B. probably did not meet the requirements for involuntary commitment but reported she suffered from reactive attachment disorder, conduct disorder, bipolar II disorder manic type, and attention deficit disorder.[2] T.B. complains this diagnosis is invalid, unreliable, indefinite, and does not, in any event, indicate dangerousness. On September 26, the day before T.B. was released from detention, her parents approached

---

[2] "Reactive attachment disorder" is an alleged lack of selectivity in the choice of attachment figures. "Conduct disorder" is an alleged pattern of failure to conform to societal norms. "Bipolar II disorder manic type" occurs when one is currently or most recently in a manic episode; i.e., a period during which mood is either elevated, expansive, or irritable, causing marked impairment in usual social activities. "Attention deficit disorder" is the failure to give close attention to details or the making of mistakes in schoolwork or other tasks. These alleged conditions are purportedly defined in the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1995) published by the American Psychiatric Association (hereafter DSM-IV). For example, the manual's diagnostic criteria for "attention-deficit/hyperactivity disorder" is as follows:

A. Either (1) or (2)

(1) six (or more) of the following symptoms of inattention have persisted for at least 6 months to a degree that is maladaptive and inconsistent with developmental level:

*Inattention*

(a) often fails to give close attention to details or makes careless mistakes in schoolwork, work, or other activities

(b) often has difficulty sustaining attention in tasks or play activities

(c) often does not seem to listen when spoken to directly

(d) often does not follow through on instructions and fails to finish schoolwork, chores, or duties in the workplace (not due to oppositional behavior or failure to understand instructions)

(e) often has difficulty organizing tasks and activities

(f) often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (such as schoolwork or homework)

(g) often loses things necessary for tasks or activities (e.g., toys, school assignments, pencils, books, or tools)

(h) is often easily distracted by extraneous stimuli

(i) is often forgetful in daily activities

(2) six (or more) of the following symptoms of **hyperactivity-impulsivity** have persisted for at least 6 months to a degree that is maladaptive and inconsistent with developmental level:

*Hyperactivity*

(a) often fidgets with hands or feet or squirms in seat

(b) often leaves seat in classroom or in other situations in which remaining seated is expected

(c) often runs about or climbs excessively in situations in which it is inappropriate (in adolescents or adults, may be limited to subjective feelings of restlessness)

(d) often has difficulty playing or engaging in leisure activities quietly

(e) is often "on the go" or often acts as if "driven by a motor"

(f) often talks excessively

*Impulsivity*

(g) often blurts out answers before questions have been completed

(h) often has difficulty awaiting turn

(i) often interrupts or intrudes on others (e.g., butts into conversations or games)

B. Some hyperactive-impulsive or inattentive symptoms that caused impairment were present before age 7 years.

C. Some impairment from the symptoms is present in two or more settings (e.g., at school [or work] and at home).

D. There must be clear evidence of clinically significant impairment in social, academic, or occupational functioning.

E. The symptoms do not occur exclusively during the course of a Pervasive Developmental Disorder, Schizophrenia, or other Psychotic Disorder and are not better accounted for by another mental disorder (e.g., Mood Disorder, Anxiety Disorder, Dissociative Disorder, or a Personality Disorder). . . .

for T.B.'s admission. Based on Dr. Huffine's evaluation, a chronology from T.B.'s mother, and a social worker's report, the hospital admitted T.B. in absentia.

At midday on September 27 T.B. was involuntarily transported to Fairfax by private ambulance, strapped to a gurney in five-point restraints, because police had refused to transport the child. Upon arrival Fairfax continued to keep T.B. in restraints. She was physically separated from her belongings, including her written request for release. Notwithstanding, she specifically informed Fairfax staff that she had a paper in her belongings she wanted to give to them (demanding her release), although she was prevented from physically delivering it.

Fairfax personnel refused repeated attempts by T.B.'s attorneys to contact T.B. by telephone. Not until 9:20 p.m. on September 27 was T.B. allowed to call her attorney, after which she presented a new written demand for discharge to Fairfax staff. Clerk's Papers at 14. However, Fairfax refused to either release T.B. or provide for a judicial hearing to authorize her continued commitment.

An application for a writ of habeas corpus was filed on the morning of September 29 and a hearing was held that afternoon. The court denied release, concluding T.B.'s parents had the legal right to place her at Fairfax Hospital, that T.B.'s demand for release did not trigger any duty on the part of the parents to file anything with the court, and procedures utilized met the requirements of due process.

---

DSM-IV at 83-85.

The method and mode of prior DSM classification systems has been criticized as unreliable and invalid in scholarly publications including STUART A. KIRK & HERB KUTCHINS, THE SELLING OF DSM: THE RHETORIC OF SCIENCE AND PSYCHIATRY (1992) and 1 JAY ZISKIN & DAVID FAUST, COPING WITH PSYCHIATRIC AND PSYCHOLOGICAL TESTIMONY 160-219 (4th ed. 1988). One scholar has commented ". . . there is no behavior or person that a modern psychiatrist cannot plausibly diagnose as abnormal or ill." THOMAS S. SZASZ, M.D., THE MANUFACTURE OF MADNESS 35 (citing THOMAS S. SZASZ, THE MYTH OF MENTAL ILLNESS (1961) and LAW, LIBERTY, AND PSYCHIATRY (1963)). See also Luis Kutner, The Illusion of Due Process in Commitment Proceedings, 57 Nw. U. L. REV. 383-99 (Sept.-Oct. 1962). See generally James E. Beaver, The "Mentally Ill" and the Law: Sisyphus and Zeus, 1968 UTAH L. REV. 13.

Although Fairfax successfully resisted T.B.'s habeas corpus petition through submission of some of her medical records to the trial court, Fairfax staff refused to allow T.B.'s lawyer to review her complete hospital records. Subsequently, T.B.'s lawyers sought and obtained an order from a commissioner of the Court of Appeals forcing Fairfax to grant her attorneys access to those records pursuant to RCW 71.34.200(4).[3]

Fairfax continued to detain T.B. without hearing (aside from this habeas corpus proceeding) relying upon RCW 71.34.030.[4] Neither the parents nor the hospital filed any

---

[3]The fact of admission [to a mental hospital] and all information obtained through treatment under this chapter is confidential. Confidential information may be disclosed only:

. . . .

(4) To the minor, the minor's parent, and the minor's attorney, subject to RCW 13.50.100 . . . .

[4]RCW 71.34.030 was amended to read as follows (crossed out language was removed by Becca bill amendments, underlined material was added by Becca bill amendments):

(1) Any minor thirteen years or older may request and receive outpatient treatment without the consent of the minor's parent. Parental authorization is required for outpatient treatment of a minor under the age of thirteen.

(2) When in the judgment of the professional person in charge of an evaluation and treatment facility there is reason to believe that a minor is in need of inpatient treatment because of a mental disorder, and the facility provides the type of evaluation and treatment needed by the minor, and it is not feasible to treat the minor in any less restrictive setting or the minor's home, the minor may be admitted to an evaluation and treatment facility in accordance with the following requirements:

(a) ((A minor under thirteen years of age may only be admitted on the application of the minor's parent.

(b))) A minor ((thirteen years or older)) may be voluntarily admitted by application of the parent. ((Such application must be accompanied by the written consent, knowingly and voluntarily given, of the minor.)) The consent of the minor is not required for the minor to be evaluated and admitted as appropriate.

(((c))) (b) A minor thirteen years or older may, with the concurrence of the professional person in charge of an evaluation and treatment facility, admit himself or herself without parental consent to the evaluation and treatment facility, provided that notice is given by the facility to the minor's parent in accordance with the following requirements:

(i) Notice of the minor's admission shall be in the form most likely to reach the parent within twenty-four hours of the minor's voluntary admission and shall advise the parent that the minor has been admitted to inpatient treatment; the location and telephone number of the facility providing such treatment; and the name of a professional person on the staff of the facility providing treatment who is designated to discuss the minor's need for inpatient treatment with the parent.

(ii) The minor shall be released to the parent at the parent's request for release unless the facility files a petition with the superior court of the county in which treatment is being provided setting forth the basis for the facility's belief that the minor is in need of inpatient treatment and that release would constitute a threat to the minor's health or safety.

(iii) The petition shall be signed by the professional person in charge of the facility or that person's designee.

(iv) The parent may apply to the court for separate counsel to represent the parent if the parent cannot afford counsel.

(v) There shall be a hearing on the petition, which shall be held within three judicial days from the filing of the petition.

(vi) The hearing shall be conducted by a judge, court commissioner, or licensed attorney designated by the superior court as a hearing officer for such hearing. The hearing may be held at the treatment facility.

(vii) At such hearing, the facility must demonstrate by a preponderance of the evidence presented at the hearing that the minor is in need of inpatient treatment and that release would constitute a threat to the minor's health or safety. The hearing shall not be conducted using the rules of evidence, and the admission or exclusion of evidence sought to be presented shall be within the exercise of sound discretion by the judicial officer conducting the hearing.

(((d))) (c) Written renewal of voluntary consent must be obtained from the applicant ((and the minor thirteen years or older)) no less than once every twelve months.

(((e))) (d) The minor's need for continued inpatient treatments shall be reviewed and documented no less than every one hundred eighty days.

(3) A notice of intent to leave shall result in the following:

(a) Any minor under the age of thirteen must be discharged immediately upon written request of the parent.

(b) Any minor thirteen years or older voluntarily admitted may give notice of intent to leave at any time. The notice need not follow any specific form so long as it is written and the intent of the minor can be discerned.

(c) The staff member receiving the notice shall date it immediately, record its existence in the minor's clinical record, and send copies of it to the minor's attorney, if any, the county-designated mental health professional, and the parent.

(d) The professional person in charge of the evaluation and treatment facility shall discharge the minor, thirteen years or older, from the facility within

further petition or application with the court to allow, order, or justify continued confinement.

■■ On October 18, 1995, T.B. escaped from Fairfax Hospital. However the case is not moot because she still faces the possibility of reincarceration and therefore the court can provide appellant effective relief. *In re LaBelle*, 107 Wn.2d 196, 200, 728 P.2d 138 (1986). Moreover the claim represents a question of public nature which is likely to recur and for which an authoritative determination is desirable. *In re Harris*, 98 Wn.2d 276, 278, 654 P.2d 109 (1982); *LaBelle*, 107 Wn.2d at 200.

First we must properly apply RCW 71.34, the "Becca bill" amendments, to these facts.

The statute as amended defines the process for initial involuntary detention, as well as subsequent involuntary commitment. Under pre-1995 law a minor 13 or over could be admitted voluntarily with his or her own consent; however, if against his or her wishes, such minor could be admitted only upon an application for initial detention filed in superior court by the CDMHP. RCW 71.34.050(1), (2).[5] Before the amendments, parents lacked statutory

twenty-four hours after receipt of the minor's notice of intent to leave, unless the county-designated mental health professional or a parent or legal guardian files a petition or an application for initial detention within the time prescribed by this chapter.

(4) The ability of a parent to apply to a certified evaluation and treatment program for the involuntary admission of his or her minor child does not create a right to obtain or benefit from any funds or resources of the state. However, the state may provide services for indigent minors to the extent that funds are available therefor.

LAWS OF 1995, ch. 312, § 52.

[5]RCW 71.34.050. Minor thirteen or older who presents likelihood of serious harm or is gravely disabled—Transport to inpatient facility—Petition for initial detention—Notice of commitment hearing—Facility to evaluate and admit or release minor

(1) When a county-designated mental health professional receives information that a minor, thirteen years or older, as a result of a mental disorder presents a likelihood of serious harm or is gravely disabled, has investigated the specific facts alleged and of the credibility of the person or persons providing the information, and has determined that voluntary admission for inpatient treatment is not possible, the county-designated mental health professional may take

authority to admit minors 13 or over to a mental health facility against the child's will.

Once "voluntarily" admitted, whether upon the minor's initiative or by a parent with the minor's consent, the minor 13 or older could request discharge at any time. RCW 71.34.030(3)(b). Upon such request, the statute mandated either the minor be discharged within 24 hours or the CDMHP file a petition in superior court for "initial detention" to justify a continued hold for further evaluation. RCW 71.34.030(3)(d); RCW 71.34.050(2); Washington Rules of Court, Superior Court Mental Proceedings Rule (hereinafter MPR) 6.1A. This "initial detention" was a 72-hour evaluation period which began when a minor 13 or over was first held at the facility against her will. In the case of "voluntary" admission, "initial detention" began upon her request to leave, unlike "involuntary" admission which began at the time of initial admission. RCW 71.34.060(5) (*see infra* n.6); RCW 71.34.020(23) (*see infra* p. 450).

In all such cases the minor held against her will during the initial 72-hour detention was statutorily guaranteed several express rights: to receive, within 12 hours, a copy of the petition for initial detention and a statement of rights; to receive a court-appointed attorney; to openly communicate with the outside, including with an attorney; and for judicial oversight of the petition for initial deten-

the minor, or cause the minor to be taken, into custody and transported to an evaluation and treatment facility providing inpatient treatment.

(2) Within twelve hours of the minor's arrival at the evaluation and treatment facility, the county-designated mental health professional shall serve on the minor a copy of the petition for initial detention, notice of initial detention, and statement of rights. The county-designated mental health professional shall file with the court on the next judicial day following the initial detention the original petition for initial detention, notice of initial detention, and statement of rights along with an affidavit of service. The county-designated mental health professional shall commence service of the petition for initial detention and notice of the initial detention on the minor's parent and the minor's attorney as soon as possible following the initial detention.

tion. RCW 71.34.050(2), (3); RCW 71.34.060.[6] As a precondition to filing a petition for initial detention the CDMHP was required to conclude the minor posed a likelihood of serious harm to self, others, or property, or was gravely disabled as a result of a mental disorder. MPR 6.1A(c); RCW 71.34.050(1).

■■ The statutory changes relevant to this appeal are largely contained in RCW 71.34.030. That statute as amended permits the minor to be "voluntarily admitted by application of the parent," RCW 71.34.030(2)(a). However, the amended statute retained the original statutory right that "[a]ny minor thirteen years or older voluntarily admitted may give notice of intent to leave at any

---

[6]71.34.060. Examination and evaluation of minor approved for inpatient admission—Referral to chemical dependency treatment program—Right to communication, exception—Evaluation and treatment period

(1) Each minor approved by the facility for inpatient admission shall be examined and evaluated by a children's mental health specialist as to the child's mental condition and by a physician as to the child's physical condition within twenty-four hours of admission. Reasonable measures shall be taken to ensure medical treatment is provided for any condition requiring immediate medical attention.

(2) If, after examination and evaluation, the children's mental health specialist and the physician determine that the initial needs of the minor would be better served by placement in a chemical dependency treatment facility, then the minor shall be referred to an approved treatment program defined under RCW 70.96A.020.

(3) The admitting facility shall take reasonable steps to notify immediately the minor's parent of the admission.

(4) During the initial seventy-two hour treatment period, the minor has the right to associate or receive communications from parents or others unless the professional person in charge determines that such communication would be seriously detrimental to the minor's condition or treatment and so indicates in the minor's clinical record, and notifies the minor's parents of this determination. In no event may the minor be denied the opportunity to consult an attorney.

(5) If the evaluation and treatment facility admits the minor, it may detain the minor for evaluation and treatment for a period not to exceed seventy-two hours from the time of provisional acceptance. The computation of such seventy-two hour period shall exclude Saturdays, Sundays, and holidays. This initial treatment period shall not exceed seventy-two hours except when an application for voluntary inpatient treatment is received or a petition for fourteen-day commitment is filed.

(6) Within twelve hours of the admission, the facility shall advise the minor of his or her rights as set forth in this chapter.

time." RCW 71.34.030(3)(b). This section, as amended in 1995, provides:

> (d) The professional person in charge of the evaluation and treatment facility shall discharge the minor, thirteen years or older, from the facility within twenty-four hours after receipt of the minor's notice of intent to leave, unless the county-designated mental health professional <u>or a parent or legal guardian</u> files a petition <u>or an application</u> for initial detention within the time prescribed by this chapter.

(Underlined material added by 1995 amendment.)

T.B. claims delivery of her notice of intent to leave the facility invoked her statutory right to discharge within 24 hours unless the CDMHP or her parents then filed a petition or application with the superior court for initial detention. The hospital and parents argue "application" in RCW 71.34.030(3)(d) relates back to the "application" a parent may submit to the hospital for initial *admission* of the child to the facility but does not require "filing" a new application to retain the child in custody in response to a notice of intent to leave. (Emphasis added.) We disagree. The "application" referenced in .030(3)(d) is "an application for *initial detention*," not one to "be voluntarily *admitted* by application of the parent." (Emphasis added.) Detention and admission are not necessarily the same but are distinct terms of art as used in the statute.

"Start of initial detention" is statutorily defined:

> "Start of initial detention" means the time of arrival of the minor at the first evaluation and treatment facility offering inpatient treatment if the minor is being involuntarily detained at the time. With regard to voluntary patients, "start of initial detention" means the time at which the minor gives notice of intent to leave under the provisions of this chapter.

RCW 71.34.020(23).

Pursuant to RCW 71.34.030(2)(a) this child was "voluntarily admitted by application of the parent." The text includes in the class of "voluntary admissions" those

minors admitted by their parents without the child's consent. "When the language of a statute is unambiguous, courts may not alter the statute's plain meaning by construction." *State v. Bostrom*, 127 Wn.2d 580, 586-87, 902 P.2d 157 (1995).

RCW 71.34.030(3)(b) also expressly allows "[a]ny minor thirteen years or older voluntarily admitted may give notice of intent to leave at any time." That again is precisely what here occurred.

RCW 71.34.030(3)(d) mandates the minor be released within 24 hours of notice of intent to leave unless "a petition or an application for initial detention" is then "file[d]." The word "files" predated the 1995 amendments, was not changed by the 1995 amendments, and therefore must mean the same now as then, i.e., filing a document in superior court which invokes the jurisdiction of the court to conduct a commitment hearing within 72 hours. RCW 71.34.050(3). This commitment hearing is to determine whether the minor will be held for an additional 14 days. The procedure for this commitment hearing is outlined in RCW 71.34.080 and was not changed by Becca bill amendments.

Although the statute does not mandate the contents of the "application" beyond expressly providing it shall be "for initial detention," the amendment allows the parent, as distinguished from the county-designated mental health professional, to file this application in superior court, thus promoting the statutory purpose to grant parents greater participation in treatment decisions (Laws of 1995, ch. 312, § 1) while "protect[ing] the rights of minors against needless hospitalization and deprivations of liberty." RCW 71.34.010. However here neither petition nor application for initial detention was filed the next judicial day, *see* RCW 71.34.050(2), or at any time. Continued detention of T.B. beyond 24 hours after her demand for release therefore violated the statute.

■ A second statutory violation occurred when T.B. was denied immediate access to counsel and subsequent access

to her medical records. RCW 71.34.050(3) expressly commands "[a]t the time of initial detention . . . [t]he minor shall be advised that he or she has a right to communicate immediately with an attorney and that he or she has a right to have an attorney appointed to represent him or her before and at the hearing if the minor is indigent." Similarly, RCW 71.34.060(4) mandates ". . . [i]n no event may the minor be denied the opportunity to consult an attorney." Not only was T.B. denied the right to consult with an attorney for several hours after initial detention, but also the hospital willfully refused to honor T.B.'s request for a copy of her file until ultimately ordered to do so by a commissioner of the Court of Appeals. While discovery was withheld from the child and her attorney the hospital resisted the habeas corpus proceeding by relying upon portions of records included within the chart it refused to release to the child's attorney. Clerk's Papers at 56, 63, 70-73, 80-82.

██ We cannot ignore these statutory violations in light of our previous holding that "[t]here is no question that due process guaranties must accompany involuntary commitment for mental disorders," *In re Harris*, 98 Wn.2d 276, 279, 654 P.2d 109 (1982) (citing *In re Levias*, 83 Wn.2d 253, 517 P.2d 588 (1973), *overruled on other grounds by Dunner v. McLaughlin*, 100 Wn.2d 832, 676 P.2d 444 (1984)); *In re Quesnell*, 83 Wn.2d 224, 517 P.2d 568 (1973); and *Addington v. Texas*, 441 U.S. 418, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979), as well as United States Supreme Court recognition that involuntary commitment represents "a massive curtailment of liberty," *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S. Ct. 1048, 1052, 31 L. Ed. 2d 394 (1972). As stated in *Harris*: "Commitment is designed to be beneficial, but it can be harmful. The injurious effect of commitment can be manifested in a very short time . . . [and,] [i]n addition, social stigmatization attaches to those who have been committed because of mental illness." *Harris*, 98 Wn.2d at 279-80.

Deprivation of these statutory rights in the context of

such a massive curtailment of liberty as commitment to a mental institution also constitutes a deprivation of that process due under the Fourteenth Amendment to the United States Constitution because the deprivation is without lawful authority. Once a state has granted a liberty interest by statute, as it undoubtedly did here, "due process protections are necessary 'to insure that the state-created right is not arbitrarily abrogated.' " *Vitek v. Jones,* 445 U.S. 480, 489, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980) (quoting *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974)). *See also In re Dowell,* 100 Wn.2d 770, 773, 674 P.2d 666 (1984); *Punton v. City of Seattle Pub. Safety Comm'n,* 32 Wn. App. 959, 967-68, 650 P.2d 1138 (1982), *review denied,* 98 Wn.2d 1014 (1983).

In light of this disposition T.B.'s motion to strike portions of Respondent's Brief for failure to comply with RAP 10.3 is moot and the alternative request to remand for further evidence to allow the record to be supplemented is denied.

■ Fairfax, as the moving party, asks this court to strike appendices to the ACLU amicus curiae brief which contained 11 scholarly articles and excerpts[7] (as well as references in its brief to those articles) claiming the appellate court can consider only the precise record presented

---

[7]Gary B. Melton, *Toward "Personhood" for Adolescents,* AMERICAN PSYCHOLOGIST (Jan. 1983); Gary B. Melton, *Family and Mental Hospital as Myths: Civil Commitment of Minors,* 4 CHILDREN, MENTAL HEALTH, AND THE LAW 151 (N. Dickon Reppucci et al. eds., 1984); Banning Lyon, *Youth Pays Dearly for Year in Institution,* NEW YORK TIMES, A25 (Oct. 13, 1993); *The Profits of Misery: How Inpatient Psychiatric Treatment Bilks the System and Betrays Our Trust,* Hearing Before the Select Comm. on Children, Youth, and Families, House of Representatives, 102d Cong. 2d Sess. (1992); JOE SHARKEY, BEDLAM: GREED, PROFITEERING AND FRAUD IN A MENTAL HEALTH SYSTEM GONE CRAZY (1994); LOUISE ARMSTRONG, AND THEY CALL IT HELP: THE PSYCHIATRIC POLICING OF AMERICA'S CHILDREN (1993); AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 37 (4th ed. 1995); Stuart A. Kirk & Herb Kutchins, *Is Bad Writing a Mental Disorder?,* NEW YORK TIMES, A11 (June 20, 1994); Benedetto Vitiello, M.D., et al., *Reliability of DSM-III Diagnoses of Hospitalized Children,* 41 HOSPITAL AND COMMUNITY PSYCHIATRY 63 (Jan. 1990); STUART A. KIRK & HERB KUTCHINS, THE SELLING OF DSM: THE RHETORIC OF SCIENCE IN PSYCHIATRY 238-44 (1992); Jill Leslie Rosenbaum & Lorraine Prinsky, *The Presumption of Influence: Recent Responses to Popular Music Subcultures* 37 CRIME & DELINQUENCY 528 (Oct. 1991).

to the trial court, and this material was not in it. However, we do not understand nor do we consider these authorities to establish the specific facts of this case but rather "legislative facts" which the court may consider when determining the constitutionality or interpretation of a statute. *See* Washington Rules of Court, Rule of Evidence 201(a) cmt.; *Houser v. State*, 85 Wn.2d 803, 540 P.2d 412 (1975), *overruled on other grounds by State v. Smith*, 93 Wn.2d 329, 610 P.2d 869 (classification and standards of equal protection), *cert. denied*, 449 U.S. 873, 101 S. Ct. 213, 66 L. Ed. 2d 93 (1980); *Wyman v. Wallace*, 94 Wn.2d 99, 102, 615 P.2d 452 (1980); 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 49 (3d ed. 1989). *Compare In re Harris*, 98 Wn.2d at 279-80 (quoting senate committee testimony on harm caused by involuntary commitment in mental hospitals). Since this material was properly submitted the motion to strike is denied.

The order of the trial court is reversed, the writ of habeas corpus is granted, and T.B. is freed from restraint, or threat of restraint, in this proceeding. As the prevailing party she shall recover her costs.

DURHAM, C.J., and SMITH and ALEXANDER, JJ., concur. MADSEN, J., concurs in the result only.

DOLLIVER, J. (concurring) — I disagree with the majority decision on three points. First, the majority fails to discuss adequately the factual background leading up to T.B.'s admission to CPC Fairfax Hospital. Second, the majority misreads the "Becca bill" amendments to RCW 71.34. Finally, the majority claims it does not reach the constitutional issues raised by T.B., yet the majority decision contains explicit statements condemning as unconstitutional the "massive curtailment of liberty" caused by T.B.'s admission to Fairfax. Majority op. at 452. Since the case can be resolved on statutory grounds, the majority's underhanded condemnation of the statute as unconstitutional is inappropriate. Nonetheless, I concur with the

holding that, under RCW 71.34 as amended by the Becca bill, Fairfax Hospital officials and T.B.'s parents could not hold T.B. in the hospital against her will without filing a petition for involuntary commitment in court.

The majority gives an extremely sanitized version of the factual background leading up to T.B.'s involuntary hospitalization. The selective facts given by the majority depict T.B.'s parents as irresponsible guardians who tried to institutionalize their child just because she threw temper tantrums. To the contrary, T.B.'s parents placed T.B. in a mental hospital as a last resort to keep T.B. from further harming herself.

A brief synopsis of T.B.'s severe behavioral problems shows why her parents sought to admit T.B. at Fairfax. Some of the history given by the parents is as follows:

**1993 – 1994:** T.B. started to have violent outbursts at home, resulting in police officers being called to the home on more than one occasion.

**June 1994:** T.B. attempted to commit suicide by taking an overdose of her father's medicine.

**1992 – 1995:** T.B.'s parents tried family counseling and they also tried to get T.B. to see several different psychiatrists, but T.B. was uncooperative and never successfully completed therapy with any of the counselors or doctors.

**June 1995:** A family doctor prescribed Prozac for T.B., and her behavior greatly improved; but soon thereafter T.B. secretly stopped taking her medicine, and the problems continued.

**August 12, 1995:** T.B. ran away from home.

**August 15, 1995:** T.B.'s parents filed a runaway report. T.B.'s parents arranged for T.B. to stay with a girl friend's family to cool off, but T.B. ran away from that home, too.

**August 21, 1995:** T.B. was arrested with another child for shoplifting.

**August 23, 1995:** T.B.'s parents filed a youth-at-risk petition. At this point T.B. was staying at a youth shelter, where she was notified of the hearings.

**August 28, 29, 1995:** Two hearings were held, and T.B. failed to appear at either. An arrest warrant was issued for T.B.

**August 30, 1995:** T.B. was again arrested for shoplifting, and was released from custody.

**September 1, 1995:** T.B. was arrested on the warrant and held at a juvenile detention center.

**September 5, 1995:** A hearing was held where T.B. was ordered to stay at a youth shelter, to go for psychiatric evaluation, and attend school.

**September 7, 1995:** T.B. appeared at a psychiatrist's office for the court-ordered evaluation, but she ran from the office after 10 minutes and never completed the evaluation.

**September 8, 1995:** T.B. ran from the youth shelter and stopped attending school.

**September 12, 1995:** Police picked up T.B. and a friend on Broadway at 1:30 a.m. as runaways.

**September 19, 1995:** T.B. was arrested and brought into detention, where she was found to have a sexually transmitted disease (STD). She was given treatment and a pregnancy test. (This allegation does not appear in the record — it is asserted in the brief submitted by T.B.'s parents. *See* Br. at 10.)

**September 20, 1995:** T.B. was ordered to serve seven days in detention for contempt of court and violation of the court orders. While in detention, the court allowed Dr. Charles Huffine, a psychiatrist, to evaluate T.B.

**September 27, 1995:** When T.B. was released from detention, T.B.'s parents dismissed the youth-at-risk petition and had T.B. transported to Fairfax Hospital for inpatient treatment. Fairfax admitted T.B. based upon the Huffine evaluation, a chronology given by T.B.'s mother, and a report by a social worker.

T.B.'s parents did not place T.B. in a mental hospital merely because she had temper tantrums, as implied by the majority. T.B. was a 15-year-old runaway living on the

streets. She was shoplifting, she was sexually active, resulting in her contracting an STD, and her parents suspected she may have been using illegal drugs. Br. at 9. T.B.'s parents utilized available resources from the Department of Social and Health Services (DSHS) and the juvenile court, but T.B.'s destructive behavior continued. Even after a youth-at-risk petition was filed, T.B. blatantly ignored the court orders and continued to engage in dangerous and destructive behavior. T.B.'s parents saw hospitalization as a final, desperate attempt to solve T.B.'s problems and prevent T.B. from seriously harming herself.

In admitting T.B. to Fairfax, T.B.'s parents relied on RCW 71.34, as amended by the Becca bill, Laws of 1995, ch. 312. The majority contends RCW 71.34 allowed T.B. to be held until she demanded to be released, after which a petition for initial detention had to be filed in court. This reading is in error.

Prior to the Becca bill amendments, there were just two categories of minors who could be admitted to a mental hospital under RCW 71.34. A minor 13 years or older could be admitted to a mental hospital if the minor consented to the admission (voluntary admission); or, if the minor refused to consent but needed treatment, the minor could be forcibly admitted by the State (involuntary admission), in which case the county designated mental health professional (CDMHP) was required to file a petition for involuntary commitment in court. Former RCW 71.34.030-.050. Before enactment of the Becca bill, parents had no statutory right to participate in the decision to admit their adolescent children. Even if an adolescent clearly required medical help, the parents could not admit the minor without the minor's consent; and, they had no recourse if the CDMHP declined to pursue involuntary commitment of the child. The CDMHP had exclusive authority over starting involuntary commitment proceedings.

The Becca bill amended RCW 71.34.030 and enabled parents to admit a minor to a mental facility, even without the child's consent:

A minor may be voluntarily admitted by application of the parent. The consent of the minor is not required for the minor to be evaluated and admitted as appropriate.

RCW 71.34.030(2)(a) (as amended by the Becca bill, LAWS OF 1995, ch. 312, § 52, p. 1356). The effect of this amendment is not disputed in this case. Parents can now admit their unwilling child into a mental facility.

The question presented by this case is what statutory provisions in RCW 71.34 govern the continued detention and the release of T.B., who was involuntarily admitted by her parents. In setting out standards for the continued detention and ultimate release of institutionalized minors, RCW 71.34 distinguishes only between the two categories of minors that existed prior to the Becca bill — minors who voluntarily sought admission and involuntary minors admitted by the State. The Becca bill's amendments to RCW 71.34 do not appear to offer any different standards for the new category of involuntary minors who are admitted by their parents.

The State and Fairfax officials have been unable to cite any statute in RCW 71.34 that explicitly governs the detention or release of unwilling minors admitted by their parents. The hospital cites RCW 71.34.030(2), which requires the professional in charge of the facility to approve a parent's admission of a child. That subsection requires the professional to find that the minor needs inpatient treatment for a mental disorder, but the section does not address the continued detention or release of the minor. The State and Fairfax essentially argue that parents can admit their involuntary children and keep them in the hospital until they turn 18 years old, so long as the doctors in the facility feel that such hospitalization is appropriate.

T.B.'s attorneys rely on RCW 71.34.030(2)(a), quoted above, in claiming that a child admitted against her will by her parents is still a "voluntary" admittee for purposes of RCW 71.34.030(3)(b), which governs the release of voluntarily admitted minors. Under the voluntary admittee

scheme, the hospital can keep the minor until the minor demands to be released, after which the hospital or parents must either file a petition for initial detention or release the child. The majority agrees with T.B.'s reading of the statutes.

The statutory reading proposed by T.B. and adopted by the majority fails to use common sense. The majority asserts that a minor admitted by her parents *against her will* is still a "voluntary" admittee for purposes of RCW 71.34.030(3)(b)-(d). This Orwellian reading violates the general principle of statutory construction that "unlikely, absurd or strained results are to be avoided." *State ex rel. Faulk v. CSG Job Ctr.*, 117 Wn.2d 493, 500, 816 P.2d 725 (1991). *See also State v. Day*, 96 Wn.2d 646, 648, 638 P.2d 546 (1981) (literal readings of a statute resulting in absurd consequences should be avoided). A child admitted against her will cannot be other than an involuntary admittee. The Legislature recognized this fact when it added subsection (4) to RCW 71.34.030, which states:

> The ability of a parent to apply to a certified evaluation and treatment program for *the involuntary admission of his or her minor child* does not create a right to obtain or benefit from any funds or resources of the state. . . .

RCW 71.34.030(4) (emphasis added). Unwilling children admitted by their parents cannot be voluntary admittees.

The fact that RCW 71.34.030(2)(a) uses the word "voluntarily" can be explained as an oversight resulting from the Becca bill's amendment to that statute. The amendment made the following changes:

> A minor ((thirteen years or older)) may be voluntarily admitted by application of the parent. ((Such application must be accompanied by the written consent, knowingly and voluntarily given, of the minor.)) The consent of the minor is not required for the minor to be evaluated and admitted as appropriate.

LAWS OF 1995, ch. 312, § 52, p. 1356. Before the amendment, the word "voluntarily" reinforced the second

sentence, which required the child's written, knowing, and voluntary consent. The amendment struck out the sentence requiring the child's voluntary consent. The use of "voluntarily" in the first sentence no longer refers to the minor, since the statute now says the minor's consent is not necessary.

Fairfax urges a reading where the adverb "voluntarily" in the first sentence modifies the parents' act of admitting the child. It is unlikely that the adverb refers to the parents' act of admitting their child. The adverb "voluntarily" would be used to modify the parents' act of admitting the child only if the modifier operated to restrict or exclude other parental actions not covered by the statute. The only actions excluded by the modifier as read by Fairfax would be parents' "involuntarily" applying to admit their child. This reading is absurd, since parents would not "involuntarily" apply to admit their child.

If the adverb "voluntarily" in RCW 71.34.030(2)(a) does not modify the minor's giving consent, nor the parents' applying for admission, then the adverb is meaningless and must be ignored when reading the subsection. "The spirit or purpose of an enactment should prevail over the express but inept wording." *Day*, 96 Wn.2d at 648 (citations omitted).

Since an unwilling child admitted by her parent cannot be a voluntary admittee, she must be an involuntary admittee. The statutory provisions governing involuntary admittees must be applied, and those provisions do not provide different standards for admitting or detaining an unwilling child when the parents, as opposed to the State, initiate the admission.

Under RCW 71.34.050, when a minor 13 years or older is thought to be in need of psychiatric care, and it is not possible to obtain the minor's voluntary consent to inpatient treatment, the CDMHP must file a petition in court for initial detention. The petition must be filed in court on the next judicial day following the initial detention. RCW 71.34.050(2). If granted by a court, the petition

authorizes the hospital to detain the minor for 72 hours to evaluate the child's medical needs. RCW 71.34.050(3).

Before enactment of the Becca bill, the CDMHP was the only one who could initially detain an involuntary child and file the petition for initial detention. Under the Becca bill amendments, parents now have the right to admit an involuntary child. Since the child's admission is still involuntary, a petition for initial detention still must be filed under RCW 71.34.050 even when the parents initiate the child's admission. The Becca bill went one step further in providing parental participation: If the CDMHP refuses to file the petition for initial detention, the parents can now seek judicial review of that decision.

> If the minor is not taken into custody for evaluation and treatment, the parent who has custody of the minor may seek review of that decision made by the county designated mental health professional in court. The parent shall file notice with the court and provide a copy of the county designated mental health professional's report or notes.

RCW 71.34.050(1) (added by the Becca bill, LAWS OF 1995, ch. 312, § 53, p. 1358).

Since neither T.B.'s parents or the CDMHP filed a petition for initial detention in this case, T.B. should have been released. By reading RCW 71.34 to require court approval of the detention of an involuntary minor admitted by her parents, we avoid the constitutional issues raised by T.B.

My reading of RCW 71.34 is consistent with the legislative intent behind the Becca bill. The bill was designed to strengthen parents' power to control their children. Section (1) of the bill gives a powerful statement about the purpose of the legislation:

> The legislature finds that within any group of people there exists a need for guidelines for acceptable behavior and that, presumptively, the experience and maturity of parents make them better qualified to establish guidelines beneficial to and protective of their children. The legislature further finds that

it is the right and responsibility of adults to establish laws for the benefit and protection of the society; and that, in the same manner, the right and responsibility for establishing reasonable guidelines for the family unit belongs to the adults within that unit. Further, absent abuse or neglect, parents should have the right to exercise control over their children.

. . .

The legislature recognizes there is a need for services and assistance for parents and children who are in conflict. These conflicts are manifested by children who exhibit various behaviors including: Running away, substance abuse, serious acting out problems, mental health needs, and other behaviors that endanger themselves or others.

The legislature finds many parents do not know their rights regarding their adolescent children and law enforcement. Parents and courts feel they have insufficient legal recourse for the chronic runaway child who is endangering himself or herself through his or her behavior. The legislature further recognizes that for chronic runaways whose behavior puts them in serious danger of harming themselves or others, secure facilities must be provided to allow opportunities for assessment, treatment, and to assist parents and protect their children. The legislature intends to give tools to parents, courts, and law enforcement to keep families together and reunite them whenever possible.

LAWS OF 1995, ch. 312, § 1, pp. 1319-20 (redlining omitted). The bill contains over 80 different sections, and the majority of the sections deal with RCW 13.32A and RCW 74.13. Fewer than 10 of these sections deal with RCW 71.34. *See* LAWS OF 1995, ch. 312, §§ 52-58 (sections 55 and 57 were vetoed by the Governor). In these few amendments to RCW 71.34, the Legislature opened a door that was previously closed to parents: Parents can now start the procedure for the involuntary commitment of an unwilling child, and parents can seek review if the CDMHP refuses to file the petition for initial detention. RCW 71.34.050(1). Additionally, but not at issue in this case, the amendments give parents the right to seek judicial review of the

hospital's refusal to file a petition for a 14-day commitment. RCW 71.34.070(1). The amendments grant parents the new right to commit their adolescent children to mental institutions, but the amendments do not alter the standards under which a minor may be involuntarily committed.

My reading of RCW 71.34 would not prevent a parent from admitting a child when the child consents to the admission. In that case the child would be treated as a voluntary admittee until a demand for release has been made. Because of the severe restriction of liberty caused by involuntary commitment, minors admitted by their parents should be assumed to be involuntary unless the minors give express consent to the hospitalization.

In their brief, T.B.'s parents explain that, despite T.B.'s extreme behavioral problems, T.B. probably did not satisfy the traditional strict standard for involuntary commitment. RCW 71.34.080(9)(a) (minor must have a mental disorder and present a " 'likelihood of serious harm' " or be " 'gravely disabled' "). It is unfortunate that the Becca bill failed to provide T.B.'s parents any additional remedies under RCW 71.34, but this court cannot read into a statute what is not there. If the Legislature wants a lower standard for involuntarily committing minors who have been admitted by their parents, it must provide legislation explicitly setting forth that standard.

GUY, JOHNSON, and TALMADGE, JJ., concur with DOLLIVER, J.